## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

TATONYA JOHNSON                                       CIVIL ACTION

VERSUS                                                        23-1303-SDD-RLB

SE TYLOSE LOUISIANA, LLC
AND SE TYLOSE USA, INC.

## RULING

This matter is before the Court on the Motion for Summary Judgment[1] by Defendants, SE Tylose Louisiana, LLC and SE Tylose Louisiana USA, Inc. (collectively "SET" or "Defendants").  Plaintiff, Tatonya Johnson ("Plaintiff"), has filed an Opposition[2] to this motion, to which Defendants filed a Reply.[3] For the following reasons, the Court finds that Defendants' motion should be GRANTED.

## I.    FACTUAL BACKGROUND[4]

This case arises from an employment dispute occurring at SET, a limited liability company that operates plants that produce cellulose ether,[5] at its plant located in Plaquemine, Louisiana.[6]  SET offers the following version of events.

---

[1] Rec. Doc. 53.
[2] Rec. Doc. 57.
[3] Rec. Doc. 68.
[4] The factual background is derived from the Parties' Statements of Undisputed/Disputed Material Facts (Rec. Docs. 53-1, 57-1, 65) and memoranda submitted in connection with this Motion. Statements that are unsupported by citation to record evidence or constitute legal argument rather than a fact (or controverting fact) will be disregarded.
When citing deposition testimony, the Court will refer to the page number of the deposition rather than the ECF docket page number; however, when the Court is citing evidence to depositions, the Court will refer to the ECF docket page number.
[5] Rec. Doc. 29, ¶ 7.
[6] Rec. Doc. 22, ¶ 10.

### A. Plaintiff Supervised by Hiroshi Jomori

Plaintiff was interviewed in late 2013 by Hiroshi Jomori ("Jomori"), then-General Manager of SET.[7] Plaintiff agrees that she was treated fairly during this interview.[8] Plaintiff was hired to be a Customer Service Representative, and Jimori signed Plaintiff's offer letter.[9] Plaintiff began her employment with SET in January 2014. Plaintiff was initially supervised by Steve O'Neill, but Jomori, who is Japanese, became her supervisor "almost immediately" after her employment began.[10]    As a Customer Service Representative ("CSR"), Plaintiff was a "contact person to customers," and her duties included administration of orders of SET products.[11] While Plaintiff was employed at SET, the other CSRs were Kellie Mitchell ("Mitchell"), a Caucasian female, and Shaun Morvant ("Morvant"), a Caucasian male.[12]

Plaintiff claims her working relationship with Jomori was "fine" until she returned from maternity leave in 2015.[13]  When she returned to work, she claims Jomori criticized her memory saying, "you remember nothing."[14]  In June 2016, Plaintiff reported via email that her work computer was stolen from her car while staying at her mother's home; Jomori responded that "[i]t is unfortunate to seem that the area of your mom lives must always require attention to safety, considering also the incident on your husband; someone must be watching the chance."[15]  In January 2019, Jomori admonished Plaintiff

---

[7] Rec. Doc. 53-3, Plaintiff Deposition, p. 18.
[8] *Id.* at p. 19.
[9] *Id.* at p. 22; Exhibit C to Depo.
[10] *Id.* at p. 26. Plaintiff inexplicably denies this statement of fact although her own testimony is that Jomori became her supervisor "almost immediately" after her hire. Rec. Doc. 57-1, ¶ 4 (citing Johnson Depo, p. 26:6-13).
[11] *Id.* at pp. 27-28; Rec. Doc. 53-7, Jomori Deposition, p. 86.
[12] Rec. Doc. 53-3, p. 25; Rec. Doc. 53-8, Answer to Interrogatory No. 2.
[13] Rec. Doc. 53-3, p. 35.
[14] *Id.* at p. 36
[15] Rec. Doc. 53-7, Exhibit 2 to Depo.

via email, stating "[a]s a profession, I would suggest not to yawn on the phone…unless it is a cultural difference from what I think as very impolite and unprofessional."[16]  Plaintiff also claims that, when describing the shortcut she takes through what she called African-American neighborhoods, Plaintiff contends Jomori asked her "so you  have to ride through that neighborhood" and further stated "[o]h no.  I not go down by them people like that.  Too much.  Need more security. Too much danger."[17] Jomori denies making these two comments.[18]  At her deposition, Plaintiff was asked whether she addressed Jomori regarding this conduct, and she testified:

> A: Not in the beginning…
> Q: What about eventually?
> A: I did…I began to call him on things and let him know or ask him why he would treat me or respond to me much different than he did Kellie or of Shaun.
>
> ***
>
> Q: Did you flat out say, is this a race thing…?
> A: I did. I don't recall the wording, but I definitely said I felt that I was being treated differently because I was different in regard to my race…I think we had two meetings, just [Mr. Jomori] and I. I told him that I felt I was being treated differently, you know, because of my background…I don't know if – not I don't know. I don't think it was…because I'm Black, but I said because of my culture or background, I feel that I am being treated differently.[19]

Plaintiff could not recall the dates that she believes these comments occurred.[20] Plaintiff further claims that, between 2015 and 2019, Jomori would throw things at her, like throwing pens and papers on her desk that on one occasion "slid in her lap."[21]

On December 13, 2019, Plaintiff went to lunch for her birthday, which lasted an

---

[16] Rec. Doc. 53-3, pp. 48-49; Rec. Doc. 53-7, Exhibit 3 to Depo.
[17] Rec. Doc. 53-3, pp. 46-47
[18] Rec. Doc. 53-7, p. 71.
[19] Rec. Doc. 53-3, pp. 47-48.
[20] *Id.* at p. 49.
[21] *Id.* at pp. 49, 59.

hour and a half or two hours.[22]  When she returned to the office, Plaintiff claims Jomori began yelling at her and asking her who told her she could take such a long lunch.[23] During this encounter, Plaintiff claims Jomori banged on her desk, said "you know nothing," and told her to "shut up."[24]  In response, Plaintiff asked Jomori to leave her office and advised that she used an hour of vacation leave for the lunch.[25] Plaintiff admits that she spoke to Jomori "in a high pitched voice" and that "her voice got louder and louder" as she repeatedly told Jomori to leave.[26]  Plaintiff further acknowledged that she was "aware that [her] voice possibly overpowered Mr. Jomori's" and knew that it "carried more so during [her] response to Mr. Jomori on December 13th."[27] At some point, a co-worker entered the office and advised Jomori and Plaintiff to be quiet; Jomori then left.[28] Following this encounter, Plaintiff called HR Representative Kristi Parnell ("Parnell") and asked that Jomori be told to "leave [her] alone and stop yelling at [her]."[29] Parnell called Jomori,[30] and later that day, he returned to Plaintiff's office, offered her tissues, and told her she did not need to take vacation time because "no worries" and "nothing wrong."[31]

Around December 18, 2019, Plaintiff again spoke with Parnell; however, she cannot remember if she ever told Parnell she felt she was being treated differently because she was Black.[32] Parnell attested that Plaintiff never advised her in any

---

[22] *Id*. at pp. 52-53, 55.
[23] *Id.* at p. 55.
[24] *Id.*
[25] *Id.* at pp. 55-56.
[26] Rec. Doc. 53-5, p. 4.
[27] *Id.*
[28] Rec. Doc. 53-3, p. 56.
[29] *Id.* at p. 56.
[30] *Id.*
[31] *Id.* at p. 66.
[32] *Id.* at p. 68.

conversation that she felt she was being treated differently because of her race.[33]

Around December 20, 2019, Plaintiff was issued a performance improvement plan ("PIP"), and she met with Parnell and Dana Coody ("Coody"), another HR representative, to review the PIP.[34] Plaintiff secretly recorded this forty-eight-minute conversation;[35] at no time on this recording does Plaintiff mention race-based disparate treatment or different treatment than the other CSRs. On December 30, 2019, Plaintiff submitted via email an eight-page "Rebuttal to Performance Improvement Plan (PIP) and Formal Complaint."[36] Therein, Plaintiff stated that Jimori treated her differently after her pregnancy, and "[s]everal SE Tylose employees informed HR on November 4, 2019 of the work environment and how Mr. Jomori treats and speaks to others."[37] The "others" included Mitchell and Morvant.[38] SET emphasizes that "[n]owhere in Plaintiff's eight-page rebuttal does she state that Mr. Jomori treats her differently because of her race or that she felt she was being treated differently than her two CSR counterparts."[39]

During her deposition, Plaintiff was asked several questions about her rebuttal to the PIP. She testified as follows:

> Q: So I believe I've closely studied all eight pages of your rebuttal…Nowhere in here do you mention that you believe [Mr. Jomori] is treating you differently because of your race.
> A: I was afraid to, but, again –
> Q: But that's true right? You don't –
> A: No. I did not say. **I definitely did not say Mr. Jomori is mistreating me because I'm black**, but, again, as I've stated earlier, I often stated he is treating me different than others, and I was the only Black in addition to my two White counterparts.
> Q: But even that is not included in this rebuttal, correct, that he is treating me

---

[33] Rec. Doc. 53-5, Parnell Declaration, ¶¶ 7-8.
[34] Rec. Doc. 53-3, p. 69; Exhibit F to Depo.
[35] *Id.* at pp. 61-62, 84-85; Rec. Doc. 53-5, Parnell Declaration, ¶¶ 7-8.
[36] Rec. Doc. 53-3, p. 73; Rec. Doc. 53-5, ¶ 8, Attachment 1.
[37] Rec. Doc. 53-3, p. 76; Rec. Doc. 53-5, ¶ 8, Attachment 1.
[38] Rec. Doc. 53-3, pp. 76-77.
[39] Rec. Doc. 55, p. 5 (citing Rec. Doc. 53-3, p. 80; Rec. Doc. 53-5, Attachment 1).

differently than –
A: I would have to – it's in the email. It is definitely in an email somewhere.

\*\*\*

Q: Go ahead and look.
A: I would like to make note that I said here this is one of the reasons that employees have not came forward with specific issues, is because I was reprimanded as a result of being mistreated…so it really speaks to the intimidation throughout the period. You know, me being afraid to lose my job, but I know I put it in an email somewhere. I'd have to find it. If I don't have it here, I have it at home somewhere.[40]

Despite Plaintiff's claims that she mentioned her belief that the differential treatment was race-based in an email, SET notes that Plaintiff has never identified such an email, and it has not been produced in this matter.

When questioned why, during the recorded conversation, she never referenced race, Plaintiff testified: "The entire time – you know, one of the tactics with Jomori has always been intimidation. I was afraid to specifically say you are treating me different because I am Black, but, again, you know, I've said it several times…I would specifically tell him you are treating me differently than Kellie and Shaun."[41]  Plaintiff testified further:

Q: You are reporting that he screams at you, that he throws stuff at you, a lot of horrible things, but you left out the major issue that you sued the company on…If you are saying it was race discrimination, and we retaliated against you because you report[ed] race discrimination, you have no evidence of a report of a race complaint…Why didn't you either put it in a document or say it in the meeting so that the company had notice that you were saying he was doing this because you are Black and they are White?[42]

A: The treatment itself is there. The difference itself is there. I may have been afraid to say, oh, Mr. Jomori, you are doing this to me because I'm Black. Yes…I was afraid to say that, definitely. I was afraid of the retaliation…So…forgive me if I didn't say you are doing this to me because I'm Black. I didn't know it was a requirement that I spell it out.[43]

---

[40] Rec. Doc. 53-3, pp. 79-81 (emphasis added).
[41] *Id.* at pp. 84, line 19 through 85, line 2.
[42] *Id.* at p. 86, lines 6-18.
[43] *Id.* at pp. 86-87.

In July 2020, Plaintiff emailed Jomori to complain that her annual raise was only 1.5%; Plaintiff felt that her "duties and responsibilities [were] far outside the scope of her position" and that her "current salary is not aligned with similar jobs within the market…and it is not commensurate to the responsibilities I am working on a day to day basis."[44]  Jomori responded:

> The pay raise this time was based on 2019 performance (not including 2020 that so far has seen recent improvement). Evaluation is completed fairly all performance and all surrounding conditions of company and business…minimum duties were met that is appreciated…even with some occasions required your boss to track and remind over weeks and that ended with an incident that deserves incident disciplinary action.[45]

Plaintiff then asked for an opportunity to meet with Jomori to discuss the matter, to which he agreed, but Plaintiff subsequently asked him to disregard her request for a phone meeting.[46]

Plaintiff received a 1.5% increase in 2020, while Mitchell received a 1.8% increase, and Morvant received a 1.6% increase.[47] SET's merit increases for year 2020 were the lowest in many years due to uncertainty and business interruption associated with onset of the COVID-19 pandemic.[48] For every year of her employment other than 2020, Plaintiff received a higher yearly increase than both Mitchell and Morvant.[49]

## B.  Change in Management/Plaintiff Supervised by Brad Smothers

Around the end of 2021, SET moved Jomori from Louisiana to a different role in

---

[44] Rec. Doc. 53-7, Exhibit 4 to Depo. (ECF p. 21).
[45] *Id.* (ECF pp. 21, 19).
[46] *Id.* (ECF p. 17).
[47] Rec. Doc. 53-5, ¶ 13.
[48] *Id.* at ¶ 12.
[49] *Id.* at ¶ 15.

Germany.[50] Subsequently, Brad Smothers ("Smothers") joined SET as Administrative and Operations Manager in July 2022.[51] Smothers is African American.[52] Upon his hire, Smothers began supervising the CSRs — Plaintiff, Mitchell, and Morvant.[53] When he took over from Jomori, Smothers had final authority on work from home requests.[54]

Prior to Smothers assuming this role at SET, SET employees were permitted to intermittently work from home. Working from home began during the COVID 19 pandemic.[55] When Plaintiff returned to work following the pandemic, she worked a hybrid schedule whereby she arrived at work between 7:30 and 8:30 am and would leave the office around 2:00 pm.[56] Plaintiff would pick up her children from school and resume working from home usually around 4:30 to 5:00 pm.[57]

On June 29, 2022, more than a month in advance, Morvant requested to work from home for two weeks beginning on August 15, 2022 to assist his wife in recovering from a surgical procedure.[58] Morvant requested this from Jomori, who forwarded the request to SET Human Resources for approval.[59] On June 30, 2022, Morgan Voiselle, a former member of SET's HR department, approved Morvant's request.[60]

When Smothers joined SET, he conducted an initial meeting with Plaintiff and the other CSRs on July 21, 2022 where he announced that SET was moving away from hybrid

---

[50] Rec. Doc. 53-3, p. 101.
[51] *Id.*; Rec. Doc. 53-4, Smothers Deposition, p. 6.
[52] Rec. Doc. 53-3, p. 124.
[53] Rec. Doc. 53-4, pp. 12-13.
[54] Rec. Doc. 53-4, p. 73.
[55] Rec. Doc. 53-3, p. 93.
[56] *Id.* at pp. 95-97.
[57] *Id.* at p. 98.
[58] Rec. Doc. 53-5, ¶ 9, Attachment 2 to Dec.
[59] *Id.* at ¶ 10, Attachment 2 to Dec.
[60] *Id.* at ¶ 11, Attachment 2 to Dec.

work schedules and everyone was expected to return to the office.[61]  Plaintiff was approximately thirty minutes late to this meeting.[62] During this meeting, Smothers notified all employees that they were expected to work five eight-hour days, and remote work was no longer permitted.[63] Immediately following this meeting, Plaintiff met with Smothers and discussed how she had prior approval from Jomori to work a split-shift partially from home, which helped her avoid traffic and spend time with her children.[64]  SET contends Smothers explored several options with Plaintiff, one of which was that Plaintiff could arrive earlier to work – which she declined – but ultimately Smothers advised Plaintiff she was required to be in the office to work.[65]  Later, Plaintiff asked Smothers if there was an office in Baton Rouge that she could report to; Smothers responded that he would investigate and "go out of [his] way to try and find a workable solution."[66]  Plaintiff began working the eight-hour schedule where she would arrive to work at 8:00 am and work 8 hours.[67]

In Smothers' view, Plaintiff wanted a regularly scheduled, continuous work from home hybrid work schedule.[68]  In efforts to accommodate Plaintiff's needs, Smothers spoke to Sales Managers Alysia McLeod ("McLeod") and Sergio Hernandez ("Hernandez") about Plaintiff's remote work situation.[69] McLeod informed Smothers that Plaintiff was not available to her during critical portions of the workday.[70] Hernandez also

---

[61] Rec. Doc. 53-3, p. 102, Exhibit I to Depo; Rec. Doc. 53-4, Smothers Deposition, p. 26.
[62] Rec. Doc. 53-3, pp. 107-108, Exhibit J to Depo; Rec. Doc. 53-4, p. 28.
[63] Rec. Doc. 53-3, pp. 103-104, Exhibit I to Depo.
[64] *Id.* at pp. 104-105.
[65] *Id.* at pp. 105-106; Rec. Doc. 53-4, p. 39.
[66] Rec. Doc. 53-3, p. 108, Exhibit J to Depo.
[67] *Id.* at p. 107.
[68] Rec. Doc. 53-4, p. 66.
[69] *Id.* at p. 50, Exhibit 3 to Depo.
[70] *Id.*, Exhibit 3 to Depo.

expressed that he was displeased at the level of support he received from Plaintiff and sometimes felt "stranded."[71]  Hernandez advised Smothers that Plaintiff's unavailability between 11:30 to 4:00 was the time he and customers needed reports and information; he and McLeod noticed items not being handled by Plaintiff, which prompted them to offer to shift some of Plaintiff's customers to Mitchell, but Plaintiff declined.[72]

Smothers sent an email to Jomori outlining the conversations he had with McLeod and Hernandez and advising of both Plaintiff's positive work habits and the negatives, which included: (1) often unresponsive to emails; (2) inconsistent work output; (3) unhappy with office hours requirement and continues to push for remote work; (4) complains about a heavy workload but refuses to be relieved.[73]  Other SET employees expressed complaints similar to those of McLeod and Hernandez.  Jomori noted that Plaintiff sometimes "did not respond to customers by the time she is supposed to be" or "did not reply to calls from the customers" or "about the orders we received, she did not…act on the orders" or "during the hours she's supposed to be working, she seemed like she was not."[74] Coody also received complaints about Plaintiff's unavailability and her work not getting done; around June 21, 2022, Coody requested IT to evaluate whether the CSRs were consistently working 40 hours per week.[75]  This investigation, which factored in gate logs, the vacation/sick leave program, and VPN access which showed remote working, revealed that Plaintiff was averaging only twenty hours of work per week, which showed an average workday of three hours.[76]

---

[71] *Id.* at p. 50, Exhibit 3 to Depo.
[72] *Id.* at p. 50, 56 Exhibit 3 to Depo.
[73] *Id.* at p. 76, Exhibit 4 to Depo.
[74] Rec. Doc. 53-7, p. 26.
[75] Rec. Doc. 53-6, Coody Deposition, pp. 35, 85, Exhibit 2 to Depo.
[76] *Id.* at pp. 36, 38-39, Exhibit 2 to Depo.

Plaintiff testified that, around July 26, 2022, she, Mitchell, and Smothers had a conversation about month-end reporting requirements.[77]  Mitchell and Plaintiff explained to Smothers how their past work schedules allowed them to avoid traffic and attend their children's events; Smothers apologized but said they were required to work in the office.[78] Plaintiff claims Mitchell "became irate" and "yelled and screamed" that her "kids are first, and you will not get the reports," then she slammed the door and left.[79] Smothers later spoke with Mitchell by phone, advised her that her reaction was improper, but advised Mitchell that if she made a request, he would try to work with her to find a solution.[80] Mitchell then explained to Smothers that she needed two four-hour windows when she could attend her child's school orientation, and Mitchell was permitted to work remotely but limited to these two half-days in early August.[81]

Plaintiff claims she made a similar request, but Smothers testified that he did not hear such a request.[82]  Smothers further testified that he apologized to Plaintiff if he missed her request "because it was a couple conversations going on at one time," and if he missed her request "that's not her fault in that situation."[83]  Plaintiff testified that she "vaguely remember[ed] something like that.[84]  Plaintiff also claims that the recorded conversation of August 3, 2022 continued another minute or two after the recording stopped, and in this unrecorded portion, Plaintiff accused Smothers of being dishonest.[85]

After this call, Smothers emailed Jomori and advised that he just had "a very hostile

---

[77] Rec. Doc. 53-3, pp. 117-118.
[78] *Id.* at p. 118.
[79] *Id.* at pp. 118-119
[80] Rec. Doc. 53-4, p. 69.
[81] *Id.*; Rec. Doc. 53-8, Answer to Interrogatory No. 12.
[82] Rec. Doc. 53-4, pp. 69-70
[83] *Id.* at p. 70.
[84] Rec. Doc. 53-3, p. 120.
[85] *Id.*

and unprofessional conversation with Tatonya. Tatonya's sole focus in every conversation that I have had with her has been centered around the work schedule she requires to do her job…I have asked Tatonya to try and meet me halfway on her schedule request and she is not w[i]lling to. Tatonya is being very unrealistic of her expectation/demands of the company..."[86]  Smothers testified that Plaintiff's tone was "combative," he felt that Plaintiff "basically challenged" him, and this "was not a professional conversation you have in the workplace."[87]

On August 3, 2022, before her phone call with Smothers, Plaintiff emailed Jomori advising that she had fallen behind and could not close sales on time.[88] Plaintiff also communicated that she had been sick the previous week and advised Smothers that, in the past, she was able to work from home when sick to complete sales, but Smothers would not permit this.[89]  Plaintiff asked Jomori not to forward the email because she did not want "backlash."[90]

On this same date, Smothers made the recommendation to terminate Plaintiff's employment due to: (1) poor work performance, including consistent unavailability during working hours and missing critical sales deadlines; (2) her refusal and continued resistance to follow management's directives regarding work schedule; (3) misuse of her company-issued iPHone that Plaintiff admitted she allowed her daughter to use; and (4) her lack of professionalism, hostility, and temperament in communications with management.[91]  The following day, August 4, 2022, Coody informed Plaintiff that she had

---

[86] Rec. Doc. 53-4, Exhibit 5 to Depo.
[87] *Id.* at pp. 112-114.
[88] Rec. Doc. 53-3, Exhibit K to Depo (ECF p. 100).
[89] *Id.* at p. 126, Exhibit K to Depo (ECF p. 100).
[90] *Id.* (ECF p. 101).
[91] Rec. Doc. 53-8, Answer to Interrogatory No. 3.

discussed Plaintiff's phone call with Smothers, instructed Plaintiff to go home for the day, and advised that she would follow up with Plaintiff on next steps.[92]  In response, Plaintiff essentially accused Coody of "retaliating against [her] because [she] reported Brad."[93] Plaintiff also complained that she had asked Jomori not to forward her email because she did not want backlash, but "that's what [she] received immediately."[94]

The next day, August 5, 2022, Coody emailed Plaintiff at 1:18 pm asking when Plaintiff was available to talk.[95] The purpose of Coody's call was to inform Plaintiff of SET's decision to terminate her employment.[96]  Plaintiff responded to Coody at 2:06 pm that she was at the doctor's office but would call when she left; however, Plaintiff did not return Coody's call on August 5, 2022.[97]  Plaintiff acknowledged that the following day, August 6, 2022, at 10:46 am, Coody emailed Plaintiff at her personal and work email addresses and advised: "It was critical you contact me yesterday.  You failed to return my call as you stated you would.  I did try you again, and the phone went to voicemail.  Since I cannot reach you, please be advised the company has made decisions on next steps.  I am sending you important information to your personal e-mail address and also priority mailing to your home."[98]  At 10:50 am, Coody sent Plaintiff a termination letter and a severance agreement.[99] Almost four hours later, Plaintiff replied to Coody via email stating that her doctor placed her on medical stress leave.[100]

---

[92] Rec. Doc. 53-3, p. 129; Rec. Doc. 53-6, pp. 47-48.
[93] Rec. Doc. 53-3, p. 129
[94] Rec. Doc. 53-6, Exhibit 4 to Depo (ECF p. 15).
[95] Rec. Doc. 53-3, p. 134, Exhibit L to Depo (ECF p. 102).
[96] Rec. Doc. 53-6, p. 95, Exhibit 5 to Depo (ECF p. 17).
[97] Rec. Doc. 53-3, pp. 134-135, Exhibit L to Depo (ECF p. 102).
[98] *Id.* at p. 135, Exhibit M to Depo (ECF p. 103).
[99] *Id.* at pp. 135-136, Exhibit N to Depo (ECF pp. 104-106).
[100] *Id.* at p. 140, Exhibit O to Depo (ECF p. 115).

Plaintiff does not know who was hired to replace her,[101] and she has no evidence to controvert the fact that her next two replacements were African American females.[102]

### C. Plaintiff's Complaints

Unsurprisingly, Plaintiff's version of the facts differs.[103]  Plaintiff claims that she was the only Black employee in the CSR department throughout her employment.[104] Plaintiff claims she "developed and led"[105] SET's pharmaceutical warehouse system, managing logistics, inventory, invoicing, and international communications.[106] Even after Mitchell and Morvant were hired, Plaintiff claims she remained responsible for the most complex tasks, and she was not cross-trained on her colleagues' duties even though they were cross-trained on hers.[107] Plaintiff testified that she was excluded from warehouse tours and training sessions provided to her white co-workers.[108] Plaintiff testified that Jomori required her to continue performing work duties when she was on vacation and out on leave.[109]

After returning from maternity leave in 2015, Plaintiff claims she was subjected to criticism and demeaning comments by Jomori, including being mocked for her lack of memory and professionalism.[110]  Plaintiff claims Jomori regularly referred the people in her family and neighborhood as "you people," or "them people," and questioned the safety

---

[101] Rec. Doc. 53-3, p. 142.
[102] Rec. Doc. 53-9, ¶ 6.
[103] Notably, many of Plaintiff's offered "facts" (Nos. 1, 2, 3, 6, 8, 11, 12b, 18, 19, 20) are not supported by the citation provided.
[104] Rec. Doc. 61-1, p. 25:10-12. This testimony names Plaintiff's co-CSRs but does not indicate race.
[105] Rec. Doc. 57-1, ¶ 3.
[106] Rec. Doc. 61-1, pp. 27-28. Plaintiff characterizes her involvement as the developer and leader of this process; however, that is not set forth in the testimony cited.
[107] *Id.* at p. 40:12-25.
[108] *Id.* at p. 40:18-25.  Plaintiff argues she was excluded from "key meetings," but the cited testimony does not support this statement.
[109] *Id.* at p. 39:16-40:15.  Plaintiff argues this requirement was not imposed on her white co-workers, but the testimony cited does not support this.
[110] *Id.* at pp. 35:10-36:25.

of the neighborhoods in which she and her family lived.[111] In fact, Jomori attributed the theft of her work laptop during remote work to Plaintiff's neighborhood, about which Jomori allegedly remarked "it was unfortunate that my mom lived in such a bad area that require [sic] additional attention."[112] HR later acknowledged that Plaintiff was not responsible for this theft.[113]

Plaintiff claims that she raised her concerns of racial discrimination both with Jomori and HR, and she specifically alleged disparate treatment.[114] Plaintiff contends HR failed to take corrective action against Jomori despite her repeated complaints, specifically those made on November 4, December 13, and December 18, 2019.[115] Plaintiff also contends her compensation remained lower than Mitchell for the duration of their employment.[116]

In December of 2019, after returning from an extended birthday lunch in her honor, Plaintiff was publicly berated by Jomori; Plaintiff claims he yelled at her, struck her desk, and threw papers.[117] Despite Jomori's involvement in this confrontation, only Plaintiff was disciplined and placed on a PIP, which HR later withdrew upon Plaintiff's objection.[118] Plaintiff documented her objection to the PIP in an eight-page statement that described the disparate treatment she alleged.[119]

With regard to work schedule, Plaintiff claims she requested accommodation for

---

[111] *Id.* at pp. 46:3-25. Plaintiff argues these words were "racially coded language." Rec. Doc. 57-1, ¶ 8.
[112] *Id.* at p. 38:14-22
[113] *Id.* at p. 39:1-9.
[114] *Id.* at pp. 47:16-48:24; Rec. Doc. 61-25.
[115] *Id.* at p. 73; Rec. Doc. 61-9.
[116] Rec. Doc. 61-28.  Plaintiff also claims she had more experience than Mitchell and a college degree; however, the cited evidence – SET's pay table – does not support this purported fact.
[117] Rec. Doc. 61-1, pp. 55-56.
[118] Rec. Doc. 61-24; Rec. Doc. 61-3, p. 16. Plaintiff claims Coody withdrew her PIP after Plaintiff threatened to file an EEOC complaint; however, the cited evidence does not support this purported fact.
[119] Rec. Doc. 61-9.

family obligations, including her mother's dementia and her child's school orientation, but these requests were denied even though white co-workers were granted similar or greater flexibility.[120] Plaintiff maintains she regularly worked outside of regular work hours to meet client demands across time zones; she states this is confirmed by "multiple" email threads.[121]

Plaintiff was terminated on August 6, 2022, two days after Plaintiff claims she raised complaints about hostile work environment and discrimination.[122] Plaintiff also claims she was under doctor's orders not to engage in work communications due to stress, but the cited evidence does not support this contention.[123]

Plaintiff filed suit asserting race discrimination claims under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[124] These claims include hostile work environment, disparate treatment, and retaliation. Plaintiff also asserts claims of retaliation and interference under the Family and Medical Leave Act ("FMLA"). Plaintiff asserted a Discrimination in Pay Act claim, but the Court previously dismissed this claim under Title VII for failure to exhaust administrative remedies.[125] It remains available, however, under Section 1981. Notably, claims arising under Section 1981 "have a four-year statute of limitations – the default period applicable to most federal claims."[126]

---

[120] Rec. Doc. 61-1, pp.121-122; Rec. Doc. 61-4, pp. 65-66.

[121] Rec. Doc. 61-22. While this document does reflect that Plaintiff sent emails around 8:30 pm on two different dates, it does not support Plaintiff's claim that this was routine, nor it is confirmed by "multiple" emails.

[122] Rec. Doc. 61-1, pp. 134-136; Rec. Doc. 61-15. Neither of these items of evidence support Plaintiff's claim that she was fired two days after complaints of discrimination.

[123] Plaintiff also claims she was offered a severance package by SET but she declined it to pursue an EEOC case; however, the cited evidence (Rec. Doc. 61-1, p. 119) does not support this purported fact.

[124] The Fifth Circuit "consider[s] racial discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981[] under the same rubric of analysis." *Johnson v. PRIDE Indus.*, 7 F.4th 392, 399 (5th Cir. 2021). Thus, these claims will be analyzed together.

[125] Rec. Doc. 26.

[126] *Hackett v. United Parcel Service*, 736 F. App'x 444, 450 (citing *Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 341 (5th Cir. 2005)).

## II.    LAW & ANALYSIS

### A.  Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[127] This determination is made "in the light most favorable to the opposing party."[128] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[129] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[130] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[131]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[132] All reasonable factual inferences are drawn in favor of the nonmoving party.[133] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely

---

[127] FED. R. CIV. P. 56(a).
[128] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[129] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[130] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[131] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).
[132] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[133] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

how this evidence supports his claim."[134] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[135]

### B. Title VII Race Discrimination – Disparate Treatment

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's race.[136] Illegal discrimination is not the same as simple unfair treatment; indeed, "it has long been the law in this circuit that Title VII ... do[es] not protect against unfair business decisions[,] only against decisions motivated by unlawful animus."[137] Moreover, "[m]anagement does not have to make proper decisions, only non-discriminatory ones,"[138] and Title VII is not a vehicle for judicial second-guessing of business decisions[139] because courts do not determine the validity of an employer's good faith belief about an employee's competence. Thus, the issue is not whether SET treated Plaintiff fairly or whether SET's decisions were correct or erroneous; rather, the only issue is whether SET's decisions were racially motivated.

A plaintiff must present proof of a discriminatory motive.[140] A plaintiff may prove

---

[134] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

[135] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).

[136] 42 U.S.C. § 2000e-2(a)(1).

[137] *Nieto v. L&H Packing Co.*, 108 F.3d 621, (5th Cir. 1997) (citing *Turner v. Tex. Instruments, Inc.*, 555 F.2d 1251, 1257 (5th Cir. 1977), *overruled on other grounds by Burdine v. Tex. Dept. of Cmty. Affairs*, 647 F.2d 513 (5th Cir. 1981)).

[138] *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)).

[139] *Bell v. Bank of Am.*, 171 F. App'x 442, 445 (5th Cir. 2006) (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997)); *see also Armendariz*, 58 F.3d at 151 n.7 (5th Cir. 1995) (holding that establishing the employer's reason as misguided is insufficient; rather "the employee at all times has the burden of proving ... that those reasons were a pretext for unlawful discrimination").

[140] *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (citation omitted).

discriminatory motive through either direct or circumstantial evidence.[141] Direct evidence is a "statement or written document showing [the employer's] discriminatory motive on its face."[142] The evidence must be direct and unambiguous, allowing for a conclusion without any inferences or presumptions that an impermissible factor motivated the decision.[143] Vague terms are insufficient to plausibly plead discriminatory intent.[144] Further, a plaintiff's subjective belief that a vague term is discriminatory, no matter how genuine the belief, cannot provide the basis for relief.[145]

To prove race discrimination under Title VII, a plaintiff must establish that she is (1) "a member of a protected class" (2) "was qualified for the position" (3) "was subjected to an adverse employment action"; and (4) was replaced by someone outside the protected class, or a similarly situated co-worker outside the protected class was treated more favorably.[146] If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse

---

[141] *Id*. (citing *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994)).

[142] *Portis*, 34 F.3d at 329; *see also Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) ("Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.").

[143] *Moss v. BMC Software, Inc.* 610 F.3d 917, 929 (5th Cir. 2010) (internal quotations omitted) (citing EEOC, 100 F.3d 1173 at 1181).

[144] *See, e.g., Burrell v. Lab. Ready, Inc.*, No. 09-227, 2012 WL 1565360, at *5 n.13 (M.D. La. Mar. 30, 2012), (stating that the phrase "you people" is not indicative of racial animus and plaintiff's subjective belief otherwise is insufficient), *R.&R. adopted*, No. 09-227, 2012 WL 1565620 (M.D. La. Apr. 30, 2012); *Stone v. Par. of E. Baton Rouge*, No. 06-401, 2008 WL 4534374, *7 (M.D. La. Sept. 30, 2008) (holding that that there is nothing directly or indirectly race-based about the words "you people"), *aff'd* 329 F. App'x 542 (5th Cir. 2009); *Maldonado v. FirstService Residential, Inc.*, No. 20--1484, 2021 WL 2517542, at *7 (S.D. Tex. June 18, 2021) (citation omitted) (finding the phrases "those people" and "these people" were insufficient to state a § 1981 claim); *Badaiki v. Schlumberger Holdings Corp.*, No. 4:20-CV-2216, 2021 WL 6010580, at *6 (S.D. Tex. Aug. 23, 2021) (citations omitted), *R.&R. adopted*, 2021 WL 5542144 (S.D. Tex. Nov. 26, 2021), *R.&R. adopted*, 2021 WL 5769276 (S.D. Tex. Dec. 6, 2021); *McLaurin v. Waffle House, Inc.*, 178 F. Supp. 3d 536, 549 (S.D. Tex. 2016) (citation omitted); *see also Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 420 (5th Cir. 2009) (finding vague comments insufficient to establish discrimination).

[145] *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (citing *Little v. Republic Refining Co.*, Ltd., 924 F.2d 93, 96 (5th Cir. 1991)).

[146] *Saketoo v. Tulane Univ. School of Medicine*, 510 F.Supp.3d 376, 386 (E.D. La. 2020)(citing *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009))).

actions taken. [147]  If the defendant satisfies this burden of production, the burden shifts back to the plaintiff, who must "offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"[148]  Plaintiff proceeds under a pretext theory.

At the pretext stage, the issue is not whether the employer's reason was "correct or fair, but whether the decisionmakers honestly believed the [stated] reason."[149] Plaintiff must create an issue regarding whether "the employer honestly believes in the reasons it offers, not whether [the employer] made a bad decision."[150] Title VII does not permit courts to sit as a super-personnel department that reexamines an entity's business decisions or the wisdom of those decisions, only to address whether those decisions are discriminatory.[151] Courts are not to weigh the wisdom of particular employment decisions nor question every management decision and work assignment; rather, the singular issue is whether the employer's decision was motivated by discrimination.[152]

If an employer satisfies its burden of production by articulating a legitimate,

---

[147] *Lee*, 574 F.3d at 259.

[148] *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citing same in the context of a Title VII race discrimination case).

[149] *Harville v. City of Houston*, 945 F.3d 870, 877 (5th Cir. 2019)(citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) ("The issue at the pretext stage is whether Appellee's reason, even if incorrect, was the real reason for Appellant's termination.")); *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015) (citation omitted).

[150] *Harris v. Double G. Coatings, Inc.*, No. 96-60485, 1997 WL 255619, at *2 n.4, *7 (5th Cir. 1997) (citations omitted).

[151] *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 212 (5th Cir. 2018) (citations omitted); *Harris v. Double G. Coatings, Inc.*, No. 96-60485, 1997 WL 255619, at *2 n.4 (5th Cir. 1997) (citing *Ruby v. Springfield R-12 Public School Dist.*, 76 F.3d 909, 912 n.7 (8th Cir. 1996)).

[152] *See McVille v. Inter-Cmty. Healthcare, Inc.*, 460 F. App'x 353, 355 (5th Cir. 2012) (citing *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *Deines v. Tex. Dep't of Protective & Reg. Servs.*, 164 F.3d 277, 281 (5th Cir. 1999)).

nondiscriminatory reason for its decision, the presumption of discrimination "simply drops out of the picture," and the plaintiff must prove that the defendant intentionally discriminated against the plaintiff because of a protected characteristic.[153] A plaintiff satisfies this burden by establishing pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence,[154] *i.e.*, that the employer's articulated reasons were not its true reasons but a pretext for discrimination.[155] A plaintiff's prima facie case, "combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."[156] "Even in the face of sufficient evidence for a reasonable factfinder to find pretext and reject the nondiscriminatory reason, if no rational factfinder could conclude that the action was discriminatory, such as when the record conclusively reveals some other, nondiscriminatory reason for the decision, or if the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue and there is abundant and uncontroverted independent evidence that no discrimination occurred, summary judgment will be proper."[157]

Plaintiff claims she was subjected to disparate treatment based on her race in three ways: (1) SET's denial of Plaintiff's request to work from home; (2) Plaintiff's alleged pay differential; and (3) Plaintiff's termination. It is undisputed that Plaintiff has satisfied the

---

[153] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citations omitted).

[154] *Harville*, 945 F.3d at 879 (citation omitted).

[155] *Goudeau*, 793 F.3d 470, 476 (5th Cir. 2015) (citing *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000))).

[156] *Reeves*, 530 U.S. at 148; *Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 319 (5th Cir. 2020) (citation omitted); *see also St. Mary's Honor Ctr.*, 509 U.S. at 511.

[157] *Douglas v. St. John Baptist Parish Library Board of Control*, No. 21-599, 2022 WL 898746 at *12 (E.D. La. Mar. 28, 2022)(citing *Harville*, 945 F.3d at 876-77(citation omitted)).

first three prongs of her prima facie case, subject to SET's challenge to Plaintiff's work from home claim as an adverse employment action.  The Parties' primary dispute is whether Plaintiff has presented summary judgment evidence to satisfy the fourth prong, which requires Plaintiff to demonstrate that she was replaced by someone outside the protected class or that other similarly situated employees outside Plaintiff's protected class were treated more favorably. SET has presented uncontroverted evidence that Plaintiff was replaced by an African American female.[158]  Thus, the Court must determine if Plaintiff has established that she was treated less favorably than similarly situated comparators under each claim.

The law is clear that, "[i]n the context of a race discrimination claim, where the plaintiff alleges that employees who were not members of the protected class received more [favorable treatment], the plaintiff must come forward with **specific evidence** of comparators who were similarly situated."[159]  Courts within the Fifth Circuit define "similarly situated" narrowly.[160]  In evaluating whether an alleged comparator is similarly situated,

> "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor [,] or had their employment status determined by the same person[.]"[161] "Employees with different supervisors, who work for different divisions of a company ... generally will not be deemed similarly situated." The Fifth Circuit has further explained, that "employees who have different work

---

[158] Rec. Doc. 53-9, ¶ 6.

[159] *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt*, 816 F.Supp.2d 297, 316 (M.D. La. 2011)(citing *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009))(emphasis added).

[160] *See Horton v. G4S Secure Solutions (USA), Inc.*, No. 16-544-SDD-EWD, 2018 WL 1997535 at *5 (M.D. La Apr. 27, 2018)(citing *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F.Supp.2d 581, 593 (S.D. Tex. 2012); *see also Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856-57 (S.D. Tex. 2010)).

[161] *Id.* (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012)(quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009))).

responsibilities ... are not similarly situated."[162]

Additionally, a proper comparator is one that shares with a plaintiff "essentially comparable violation histories."[163]    With these principles in mind, the Court turns to Plaintiff's disparate treatment claims.

### 1.  Work From Home

Plaintiff complains that, during July and August 2022, she was denied the ability to work from home while her white co-workers Mitchell and Morvant were allowed.  SET argues that the denial of access to remote work is nothing more than a *de minimus* harm that does not constitute an adverse employment action, even considering that the Fifth Circuit recently expanded the definition of an adverse employment action in *Hamilton v. Dallas Cnty*.[164] In response, Plaintiff ignores this argument altogether, focusing solely on whether Mitchell and Morvant are proper comparators

In *Hamilton*, the Fifth Circuit overturned long-standing precedent that "adverse employment actions consist[ed] of ultimate employment decisions such as hiring, firing, demoting, promoting, granting leave, and compensating."[165] Since *Hamilton*, an "adverse employment action" encompasses more than just ultimate employment decisions; it also covers actions that affect the terms, conditions, or privileges of employment.[166] "*Hamilton* both acknowledged that Title VII 'does not permit liability for de minimis workplace trifles,' but also declined to address 'the precise level of minimum workplace harm' necessary to sustain a discrimination claim."[167] Even so, employees must establish adversity and a

---

[162] *Id.* (quoting *Lee*, 574 F.3d at 259 (citing *Wyvill v. United Cos. Life Ins*., 212 F.3d 296, 302 (5th Cir. 2000)).
[163] *Lee*, 574 F.3d at 260 (citations and footnotes omitted).
[164] 79 F.4th 494, 502 (5th Cir. 2023) (en banc).
[165] *See Smith v. Kendall,* No. 23-50713, 2024 WL 4442040, at *4-5 (5th Cir. Oct. 8, 2024) (per curiam).
[166] *See Hamilton*, 79 F.4th at 497.
[167] *Smith*, 2024 WL 4442040, at *5 (quoting *Hamilton*, 79 F.4th at 505).

non-de minimis injury.[168] Subsequently, the Supreme Court has held that, while "an employee must show some harm" from the asserted adverse employment action, "she need not show that the injury satisfies a significance test."[169] The phrase, "terms or conditions of employment," requires employees to show that the asserted adverse employment action "brought about some 'disadvantageous' change in an employment term or condition."[170]

In *Bravo v. Kendal*, the Western District of Texas, applying *Hamilton*, held that a plaintiff's "request to telework … [did] not have any [e]ffect on any condition, term, or privilege of her employment. She was not hired to work from home. She was not hired on a telework basis."[171]  "Thus, under *Hamilton* and *Muldrow*, the denial of the request to telework does not qualify as an adverse employment action."[172]

SET cites the decision by the Western District of Louisiana in *Green v. Ochsner LSU Health Shreveport*, wherein the court rejected a plaintiff's argument that "evidence of disparate treatment included the differential work-from-home permissions during a pandemic based on racial makeup."[173]  The *Green* court noted that it would not "expand the *Hamilton* standard into the sphere of these workplace trifles, absent clear direction from the Fifth Circuit. If such claims are allowed to survive at this stage, district courts would become 'super-personnel departments.'"[174] The *Green* court adopted the reasoning and analysis of the Northern District of Texas in *Sambrano v. United Airlines,*

---

[168] *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 430 (5th Cir. 2023) (per curiam).

[169] *Muldrow v. City of St. Louis,* 601 U.S. 346, 350 (2024).

[170] *Id*. at 354.

[171] No. 5:22-CV-1186-JKP, 2025 WL 965927, at *32 (W.D. Tx. Mar. 31, 2025).

[172] *Id.*

[173] No. 22-1422, 2024 WL 1057217, *8 (W.D. La. Mar. 11, 2024).

[174] *Id*. (citing *Sambrano v.United Airlines, Inc.*, 707 F.Supp.3d 652, 664 (N.D. Tex. 2023) (citing *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 214 (5th Cir. 2018)) (citing *Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006))).

*Inc.*, where two employees alleged that the masking and testing protocols of the company during the COVID-19 pandemic "altered the conditions and terms of [their] employment."[175] The *Sambrano* court found that these protocols were *de minimis* under the new standard, noting that "[i]f the *de minimis* standard excludes any workplace harm, surely it prevents judges from supervising a company's decisions regarding" the protocols, because it described the COVID-19 pandemic as a once in a century event which was "unprecedented in the modern era."[176]

It is uncontroverted that SET allowed working from home in response to the COVID-19 pandemic, that Plaintiff was initially allowed to return to work on a hybrid schedule, and that in 2022, SET changed its policy to require in person work five days a week and no longer allowed remote work on a general basis.[177] Like the plaintiff in *Bravo*, there is no evidence that Plaintiff was hired on a telework basis.  The Court finds the facts of the foregoing cases like those asserted here.  Applying *Hamilton* and adopting the reasoning and analysis from the district court cases discussed above, the Court finds that Plaintiff's general complaint about SET's remote work policy and specific claim that she was twice denied requests to work from home do not constitute an adverse employment decision but are, rather, *de minimus* workplace trifles. Plaintiff failed to substantively argue this issue, and she failed to present summary judgment evidence that shows a genuine dispute of material fact.  Accordingly, SET is entitled to summary judgment on this claim.

---

[175] 707 F.Supp.3d at 664.
[176] *Id.*
[177] Rec. Doc. 53-3, pp. 54-55.

2. <u>Pay Discrimination</u>

Plaintiff also claims disparate treatment regarding her pay in the following ways: (1) lesser 2020 yearly increase; (2) being required to work for a year before she was able to take vacation while comparators took vacation in their first year of employment; (3) she was required to work while on vacation and sick leave; and (4) she was not compensated for all the roles she had to cover.[178]

SET cries foul at Plaintiff's suggestion in her Opposition that her overall compensation during her employment as compared to Mitchell is encompassed within her pay discrimination claim: "Tatonya made less than Kellie Mitchell for the entirety of the time that she worked at SE Tylose."[179] SET contends that Plaintiff has never alleged a general, ongoing pay disparity claim, and she cannot assert a new legal theory or claim in opposition to a motion for summary judgment.

SET is correct. Plaintiff's opposition attempts to expand a discrete pay-raise claim into a broad, employment-wide compensation discrimination theory. Courts within the Fifth Circuit consistently refuse to consider such unpled theories raised for the first time at the summary judgment stage.[180] Because Plaintiff's complaint challenges only a specific raise decision, her newly asserted legal theory of ongoing pay disparity is not properly before the Court. A similar situation arose in *Loomis v. Starkville Mississippi Public School District*.[181] There, the plaintiff did not plead a salary-based pay

---

[178] Rec. Doc. 53-3, p. 46.
[179] Rec. Doc. 63, p. 28.
[180] *See Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005)("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."); *DeFranceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th Cir. 2012)([D]istrict courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment.").
[181] 150 F.Supp.3d 730 (N.D. Miss. 2015).

discrimination claim in her complaint nor was it included in her EEOC charge.[182] The court held that the plaintiff's "complaint contains no reference to salaries apart from the allegations related to the allegedly discriminatory raises. Even when couched in these terms, the complaint does not refer to a difference in salary, only a difference in 'pay increase.'"[183] Thus, the court determined that the plaintiff's complaint failed to provide "fair notice" to the Defendant "of a salary compensation claim apart from the specific decision related to discriminatory pay raises."[184] The same result is warranted here. Thus, the only pay discrimination claim properly before the Court is Plaintiff's 2020 pay raise.[185]

In 2020, Plaintiff received a 1.5% increase, Mitchell received a 1.8% increase, and Morvant received a 1.6% increase.[186] SET contends the difference amounted to $188.42 annually, roughly $15 per month.[187] Notably, 2020 is the only year since Mitchell was hired in 2017 that Plaintiff did not receive a higher yearly increase than both Mitchell and Morvant.[188] SET contends that this purported "harm" is too minimal to constitute an adverse employment action. Plaintiff does not substantively respond to or rebut SET's argument; rather, she shifts all argument to the unalleged pay disparity claim.

As discussed in the previous section, even after *Hamilton*, a plaintiff must show more than a trivial harm, as Title VII does not reach "de minimis workplace trifles." A pay differential of approximately $15 per month – less than $200 annually – is precisely the type of negligible economic impact that fails to constitute the requisite "some harm" under Title VII. Alternatively, assuming *arguendo* that $15 per month is sufficiently significant

---

[182] *Id.* at 745.
[183] *Id.* at 746.
[184] *Id.* (citations omitted).
[185] Plaintiff abandoned any other pay claims by failing to substantively oppose their dismissal.
[186] Rec. Doc. 53-5, ¶ 13.
[187] *Id.* at ¶ 14.
[188] *Id.* at ¶ 15.

to constitute an adverse employment action, Plaintiff's claim still fails because SET has demonstrated that Mitchell and Morvant were not proper comparators based on their work histories in 2019, and SET has presented unrebutted legitimate, non-discriminatory reasons for Plaintiff's slightly lower raise in 2020.

The law requires Plaintiff to show that her circumstances based on her 2019 performance were "nearly identical" to Mitchell's and Morvant's. Jomori noted in 2020 that Plaintiff's lower salary increase was based on several factors – COVID-19's effect on SET's finances, Plaintiff's mediocre work performance in 2019, and her insubordination which he believed was deserving of an incident disciplinary action.[189] Plaintiff offered no evidence that her 2019 work performance was nearly identical to Mitchell's or Morvant's. Thus, the Court finds that she has failed to establish a prima facie case of discrimination relating to the pay raise. Even if she had, these same grounds also serve as legitimate, non-discriminatory reasons for a lower salary increase which Plaintiff failed to rebut with pretext evidence.[190] While it is true that two of the three bases for the PIP were later removed, the report of insubordination remained, and the record contains absolutely no evidence – beyond Plaintiff's speculation – that the lower salary increase for 2020 was based on Plaintiff's race.

SET also raised the "same actor" inference. "[T]he 'same actor' inference creates a rebuttable presumption that an adverse action imposed on a plaintiff was not the result of unlawful discrimination when the same person both hires and fires, or imposes some

---

[189] Rec. Doc. 53-7, Exhibit 4 to Depo. (ECF pp. 17-21).
[190] *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir.2007) (quality and timeliness of work, insubordination are legitimate nondiscriminatory reasons for termination); *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167–68 (5th Cir.1999) ( "The failure of a subordinate to follow the direct order of a supervisor is a legitimate nondiscriminatory reason for discharging that employee."); *Little v. Republic Refining Co.*, 924 F.2d 93, 96 (5th Cir.1991) (poor job performance is a legitimate nondiscriminatory reason for termination).

other adverse action, on the plaintiff."[191] "[T]he inference is stronger when (1) there is close temporal proximity between the favorable employment action and the adverse action, and (2) the decision maker is in the same protected category as the plaintiff."[192]

The Court finds that the same actor inference applies here. It is undisputed that Jomori hired Plaintiff and, while her supervisor, gave Plaintiff greater salary increases than Mitchell and Morvant every year of her employment except 2020. Nevertheless, the Fifth Circuit has "decline[d] to establish a rule that no inference of discrimination could arise under such circumstances."[193] In other words, the "same actor" inference is neither mandatory nor irrebuttable. But, if "the non-moving party has otherwise failed to raise a genuine dispute as to a material fact, the 'same actor' inference simply reinforces [sic] [D]efendant's submission with respect to [Plaintiff's] race discrimination claim."[194] Although Plaintiff quotes the jurisprudence above regarding the same actor inference, highlighting that it is rebuttable, she still fails to actually rebut it by stating in conclusory fashion, "the evidence submitted by Plaintiff in support of this opposition is more than sufficient to rebut any such inference."[195] Plaintiff fails to explain or present evidence why Jomori would give her a lesser pay increase in 2020, based on her race, but then continue to give her the highest salary increases among the CSRs in the subsequent years. The Court finds that no reasonable jury could conclude from the evidence in this case that Plaintiff's lower salary increase in 2020 was based on her race.

---

[191] *Williams v. Louisiana*, No. 14-00154-BAJ-RLB, 2015 WL 5318945, at *8 (M.D. La. Sept. 11, 2015) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996) (abrogated in part on other grounds, *Russell v. McKinney Hosp. Venture,* 235 F.3d 219 (5th Cir.2000)); *Trevino v. City of Fort Worth*, No. 4:12–CV–717–A, 2013 WL 4516643, at *7 (N.D.Tex. Aug. 23, 2013).
[192] *Jones v. Wells Fargo*, No. 17-8712, 2019 WL 4601602, at *12 n.24 (E.D. La. Sept. 23, 2019) (citations omitted).
[193] *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996).
[194] *Jones*, 2019 WL 4601602, at *12.
[195] Rec. Doc. 63, p. 26.

Plaintiff's complaints about Jomori's 2016 comments about her memory, purported racially charged comments related to the safety of her family's neighborhood, and references to African Americans as "them," or "you people," are prescribed. These incidents occurred prior to September 2019, and Plaintiff cannot rely on them in support of her race discrimination claim. Alternatively, even if they were not prescribed, applicable jurisprudence clearly forecloses such comments as a basis for Title VII race discrimination. In *Stone v. Par. of E. Baton Rouge*, the Fifth Circuit held that a supervisor's use of the terms "you people" or "your people" did not support Title VII claim based on race discrimination.[196] In *Douglas v. St. John Baptist Par. Libr. Bd. of Control*, the court found that a supervisor's use of the term "you people," standing alone, was a "race-neutral" term that, "while Plaintiff may have subjectively felt they reflected discriminatory animus, are not objectively race-based statements."[197] SET is entitled to summary judgment on Plaintiff's pay discrimination claim.

### 3. Termination

Plaintiff's termination claim also fails because Plaintiff has failed to identify a similarly situated comparator with the same work history who was not terminated. SET provides several legitimate, non-discriminatory reasons, supported by competent summary judgment evidence, to justify Plaintiff's termination, including that multiple SET employees reported that: (1) she was often unresponsive to emails; (2) had inconsistent work output; (3) she was unhappy with office hours requirement and continuously pushed to work remotely; and (4) she complained about a heavy workload but refused to be

---

[196] 329 F. App'x 542, 545 (5th Cir. 2009).
[197] No. 21-599, 2022 WL 898746, at *19 (E.D. La. Mar. 28, 2022).

relieved.[198]  Jomori noted that Plaintiff sometimes "did not respond to customers by the time she is supposed to be" or "did not reply to calls from the customers" or "about the orders we received, she did not…act on the orders" or "during the hours she's supposed to be working, she seemed like she was not."[199] Coody also received complaints about Plaintiff's unavailability and her work not getting done which prompted Coody's request that IT evaluate whether the CSRs were consistently working 40 hours per week.[200]  This investigation, which factored in gate logs, the vacation/sick leave program, and VPN access which showed remote working, revealed that Plaintiff was averaging only twenty hours of work per week, which showed an average workday of three hours.[201]

Further, the record contains evidence of Plaintiff's unprofessional and insubordinate behavior. In addition to the screaming match between Plaintiff and Jomori after the birthday lunch, the evidence shows that Plaintiff challenged Smothers regarding the changed work from home policy in a manner that he reported to Jomori was "very hostile and unprofessional;"[202] that Plaintiff's tone was "combative" such that he felt Plaintiff "basically challenged" him, and this "was not a professional conversation you have in the workplace."[203]

Smothers' recommendation for Plaintiff's termination was based on the following: (1) poor work performance, including consistent unavailability during working hours and missing critical sales deadlines; (2) her refusal and continued resistance to follow management's directives regarding work schedule; (3) misuse of her company-issued

---

[198] Rec. Doc. 53-4, Exhibit 4 to Depo. (ECF pp. 31-32).
[199] Rec. Doc. 53-7, p. 26.
[200] Rec. Doc. 53-6, Coody Deposition, pp. 35, 85, Exhibit 2 to Depo.
[201] *Id.* at pp. 36, 38-39, Exhibit 2 to Depo.
[202] Rec. Doc. 53-4, Exhibit 5 to Depo.
[203] *Id.* at pp. 112-114.

iPHone (that Plaintiff admitted she allowed her daughter to use); and (4) her lack of professionalism, hostility, and temperament in communications with management.[204]

In responding to this argument, Plaintiff turns the law on its head and argues that SET failed to identify a comparator who was terminated or disciplined as she was for alleged performance or scheduling issues.[205]  However, this is not SET's burden.  Plaintiff always has the burden of demonstrating a prima facie case.  It is incumbent upon Plaintiff to identify a proper comparator.

Plaintiff offers Mitchell as a comparator citing only to Mitchell being allowed to miss work for her child's orientation while Plaintiff was not. Even though Smothers has testified that he misunderstood Plaintiff's request and apologized to her later for the misunderstanding,[206] accepting this fact as true, Mitchell remains an improper comparator. SET provided a host of reasons for Plaintiff's dismissal, not just her resistance to the work from home policy. Plaintiff has not identified a single comparator with a similar work performance history that was not terminated or disciplined in the manner she was.

To the extent Plaintiff offers Jomori as a comparator, as she has complained that he was not disciplined for their birthday lunch confrontation even though he also violated company policy,[207] this argument is also without merit.  As her supervisor, Jomori is not a proper comparator to Plaintiff.  And even if Jomori's conduct was unprofessional and rude, which the Court would not condone, it does not change the question before the Court under Title VII. The law in the Fifth Circuit is clear: "A plaintiff's supervisor is not a

---

[204] Rec. Doc. 53-8, Answer to Interrogatory No. 3.
[205] Rec. Doc. 63, p. 27.
[206] Plaintiff admitted these facts. Rec. Doc. 53-4, pp. 69-70.
[207] Rec. Doc. 63, p. 6.

valid comparator because, by definition, a plaintiff and his supervisor do not share the *same supervisor* or have their employment status determined by the same person."[208] Even when a supervisor and employee both engage in misconduct that violates company policy, courts maintain that the supervisor cannot serve as a comparator.[209]

Because Plaintiff has failed to set forth a prima facie case of race discrimination in her termination, SET is entitled to summary judgment on this claim. Even if Plaintiff had satisfied her prima facie burden, Plaintiff has failed to rebut the legitimate non-discriminatory reasons offered by SET. Importantly, Title VII does not require an employer to make proper decisions, only non-discriminatory ones.[210] Thus, Plaintiff must do more than simply argue that SET made an incorrect decision in terminating her.

Plaintiff cites Coody's Response to Plaintiff's questions about her termination and argues "[t]he evolving justifications for Plaintiff's termination – ranging from vague 'hostility,' to email delay, to misuse of company phone – highlights SET's lack of consistent rationale and support Plaintiff's claim of pretextual retaliation."[211] Plaintiff also complains that she was never "warned" or "counseled" about her phone usage or her work performance between 2019-2022.[212] Plaintiff contends this "divergence" from SET's "prior practice" is a pretext for race discrimination.

Plaintiff also complains that company policy was not followed in her termination,

---

[208] *Thomas v. Cook Children's Health Care System*, No. 2022 WL 1308039, *11 (citing *Crosby v. Computer Sci. Corp.*, 470 F. App'x 307, 309 (5th Cir. 2012) ("[T]he district court correctly determined that Condit is not a valid comparator because he was [Plaintiff's] supervisor (and therefore did not have the same supervisor as [Plaintiff]).")(original emphasis).

[209] *See Patrick v. Walmart, Incorp.*, 859 F. App'x 687 (5th Cir. 2021)(court held that supervisor who was terminated for using the N-word at work in violation of company policy was not a proper comparator to the employees he supervised that also used the N-word at work).

[210] *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991) (stating that "even an incorrect belief that an employee's performance is inadequate" is a legitimate reason).

[211] Rec. Doc. 63, p. 27.

[212] *Id.*

and she was not written up, warned, or counseled about these issues until she was "abruptly" fired.[213] Plaintiff does not provide evidence of this policy or the provisions she claims were violated. In fact, Plaintiff acknowledges in her PIP rebuttal that she "understand[s] that management has the right to escalate or skip any and all steps for discipline[.]"[214]

Plaintiff also contends Smothers had not supervised her long enough to reach this conclusion, and he relied primarily on secondhand information to support her termination. Plaintiff takes issue with the investigation into hours worked by CSRs – which investigated *all* CSRs, not just Plaintiff – and argues that SET relied on incomplete data like gate logs which, she argues, "did not account for Plaintiff's after-hours and weekend work, which she consistently performed to support international accounts."[215] Plaintiff contends she offered emails to confirm this work outside of work hours, but they were refused by HR.[216] Plaintiff cites Coody's deposition testimony to support her position, but Coody testified that she was unaware of any specific arrangement allowing the CSRs to regularly work after hours to complete their work, calling it "outside of the norm."[217] She did testify that such an arrangement may have been approved by Jomori,[218] but there is no evidence before the Court that this was allowed under the new in-office policy in place at the time of Plaintiff's termination. Further, even if Plaintiff was allowed to perform after-hours work, this does not rebut the multiple complaints by SET employees that Plaintiff was hard to reach during the workday, she was routinely unavailable when they needed her

---

[213] *Id.*
[214] Rec. Doc. 53-5, p. 9.
[215] Rec. Doc. 63, p. 30.
[216] *Id.*
[217] Rec. Doc. 61-3, p. 32:14-15.
[218] *Id.* at p. 32:21-25.

assistance, and she missed critical deadlines.[219] Further, Plaintiff's disagreement with SET's conclusions from the investigation are not actionable unless they can be tied to Plaintiff's race.  There is absolutely no evidence to support this.

Notwithstanding Plaintiff's inept challenge to SET's investigation and findings relating to her work hours, Plaintiff has failed to rebut the evidence showing that on multiple instances she was hostile, unprofessional, and insubordinate to her superiors. She admits that during the confrontation with Jomori after the birthday lunch, her "outburst was unprofessional, it was also uncontrollable at the time" based on Jomori's alleged provocation.[220] Within the Fifth Circuit, insubordination alone can be proper grounds for termination. In *Seaman v. CSPH, Inc.*, the Fifth Circuit held that an employee's termination was legitimately based on insubordination where, during a heated confrontation with his supervisor, the employee screamed at and was verbally abusive to his employer after being denied a vacation request.[221] Indeed, "chronic insubordination is considered a legitimate, nondiscriminatory reason for termination."[222] The Fifth Circuit's reasoning in *Aldrup v. Caldera* implies that even one act of insubordination is sufficient for termination.[223] Plaintiff has offered no evidence showing SET's findings of general insubordination and disrespect to management was false or pretextual. Judgment is appropriate in favor of SET on this claim.

---

[219] Rec. Doc. 53-4, p. 50; Exhibits 3 & 4 to Depo. (ECF pp. 29-32).

[220] Rec. Doc. 53-5, Attachment #1 (ECF p. 10).

[221] 179 F.3d 297, 298 (5th Cir. 1999).

[222] *Hill v. Brown*, No.  2025 WL 51574, at *3 (W.D. La. Jan 8, 2025)(citing *Chaney v. New Orleans Pub. Facility Mgmt.*, 179 F.3d 164, 167 (5th Cir. 1999)).

[223] 274 F.3d 282, 286 (5th Cir. 2001); *see also Sosa v. Coastal Corp.*, No. 02-40639, 2002 WL 31933068, at *3 (5th Cir. 2002) (where the defendant had a legitimate nondiscriminatory reason for terminating the plaintiff after only one act of insubordination).

### C. Title VII Hostile Work Environment

Title VII also makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment."[224] "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"[225]

A race-based harassment/hostile-work environment claim requires that a plaintiff establish a prima facie case that (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based upon his race; (4) the harassment affected a term or condition of her employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action.[226] For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment."[227] To meet this standard, the conduct complained of must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[228]

Critically, Title VII is not a 'general civility code.'"[229] "Simple teasing, offhand

---

[224] *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 432–33 (5th Cir. 2022) (quoting *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))).

[225] *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 106 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1))).

[226] *West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020) (per curiam) (citation omitted).

[227] *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir.2005) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

[228] *Aryain v. Wal–Mart Stores of Tex. LP*, 534 F.3d 473, 479 (5th Cir.2008); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

[229] *Heath v. Southern University System Foundation*, 2017 WL 2972909 at *5 (quoting *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) (explaining that the elements of a hostile work environment claim "are sufficiently demanding to ensure that Title VII does not

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[230] Under federal law, the mere utterance of ethnic or racial epithets that engender offensive feelings in an employee, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms, conditions, and privileges of employment.[231] The Court looks to the totality of the circumstances, considering "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance."[232] Generally, poor performance evaluations, "write-ups," and work criticism, even if unjust and unfair and in front of peers, do not rise to the level of a hostile work environment.[233]

Turning to the prima facie elements of a hostile work environment claim, Plaintiff has satisfied the first two elements: she is a member of a protected class, and she was subjected to unwelcome harassment. However, Plaintiff has failed to present sufficient summary judgment evidence to establish elements three and four. The Court notes that the four-year statute of limitations limits actionable conduct in this case to September

---

become a 'general civility code.'"); *Clark v. S. Broward Hosp. Dist.*, 601 Fed.Appx. 886, 900 (11th Cir. 2015) (quoting *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006)) ("Title VII is not a 'general civility code' and does not make 'ordinary [workplace] tribulations' actionable, so not all objectionable language and conduct will support a Title VII harassment claim.") (alteration in original ); *Reine v. Honeywell Int'l Inc.*, 362 Fed.Appx. 395, 397–98 (5th Cir. 2010) ("This high standard for judging hostility is specifically intended to prevent Title VII from becoming a 'general civility code' for the workplace.")).

[230] *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted).

[231] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 163 (5th Cir. 2007).

[232] *Rodrigue v. PTS Management Group, LLC*, 550 F.Supp.3d 376, 397 (W.D. La. 2021)(quoting *West v. City of Houston, Texas*, 960 F.3d 736, 742 (5th Cir. 2020); *Harvill*, 433 F.3d at 435).

[233] *See Kang v. Bd. of Supervisors*, 75 Fed.Appx. 974, 975–76, 977 (5th Cir.2003).

2019, unless Plaintiff successfully establishes the continuing violation doctrine.[234]

### 1. Harassment Based on Race

It is undisputed that there is no evidence in this case of an overt pejorative reference to Plaintiff's race by Jomori or Smothers. Rather, Plaintiff claims the following language and conduct by Jomori demonstrate a racial animus:[235] (1) Jomori's email to Plaintiff expressing that she should not yawn on the phone … "unless it is a cultural difference from what I think as very impolite and unprofessional" in January 2019; (2) telling Plaintiff "you know nothing," and "shut up" in December 2019; (3) throwing papers at Plaintiff at unspecified times; (4) lowering Plaintiff's raise after the birthday lunch confrontation; and (5) Jomori expressing in an October 2021 email that "the business management of subordinates requires a strong response, especially in the case of this person."[236]

---

[234] Plaintiff has not challenged the prescriptive period asserted by SET nor has she urged that the continuing violations doctrine applies. The continuing violations doctrine "does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation." *Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL-CIO, Loc. 198*, 469 F. Supp. 3d 615, 636 (M.D. La.), *on reconsideration in part*, 495 F. Supp. 3d 392 (M.D. La. 2020) (quoting *Price v. PCS Nitrogen Fertilizer, L.P.*, Civ. A. No. 03-153-RET-DLD, 2010 WL 1005181, at *4 (M.D. La. Mar. 15, 2010)).

[235] The Court notes that the purported references to "you people," them people," or the dangerousness of Plaintiff's mother's neighborhood are prescribed as they occurred in 2016; alternatively, the jurisprudence discussed herein holds that these types of references are racially neutral and not evidence of racial animus. *See, e.g., Burrell v. Lab. Ready, Inc.*, No. 09-227, 2012 WL 1565360, at *5 n.13 (M.D. La. Mar. 30, 2012), (stating that the phrase "you people" is not indicative of racial animus and plaintiff's subjective belief otherwise is insufficient), *R.&R. adopted*, No. 09-227, 2012 WL 1565620 (M.D. La. Apr. 30, 2012); *Stone v. Par. of E. Baton Rouge*, No. 06-401, 2008 WL 4534374, *7 (M.D. La. Sept. 30, 2008) (holding that that there is nothing directly or indirectly race-based about the words "you people"), *aff'd* 329 F. App'x 542 (5th Cir. 2009); *Maldonado v. FirstService Residential, Inc.*, No. 20--1484, 2021 WL 2517542, at *7 (S.D. Tex. June 18, 2021) (citation omitted) (finding the phrases "those people" and "these people" were insufficient to state a § 1981 claim); *Badaiki v. Schlumberger Holdings Corp.*, No. 4:20-CV-2216, 2021 WL 6010580, at *6 (S.D. Tex. Aug. 23, 2021) (citations omitted), *R.&R. adopted*, 2021 WL 5542144 (S.D. Tex. Nov. 26, 2021), *R.&R. adopted*, 2021 WL 5769276 (S.D. Tex. Dec. 6, 2021); *McLaurin v. Waffle House, Inc.*, 178 F. Supp. 3d 536, 549 (S.D. Tex. 2016) (citation omitted); *see also Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 420 (5th Cir. 2009) (finding vague comments insufficient to establish discrimination).

[236] Rec. Doc. 53-7, p. 67.

SET contends any connection these claims have to race is purely based on Plaintiff's subjective speculation. Moreover, SET points to Plaintiff's 48-minute recorded phone conversation with Parnell and her 8-page PIP rebuttal, arguing Plaintiff never mentions a single instance of different treatment based on race. In fact, Plaintiff's written rebuttal undermines her race discrimination claim where advises that "[s]everal SE Tylose employees informed HR on November 4, 2019 of the work environment and how Mr. Jomori treats and speaks to others."[237] SET argues this comment acknowledges that Jomori's conduct was not directed only at Plaintiff; thus, her race was not the basis for his conduct.

Plaintiff contends she "explicitly" told Jomori she believed his differential treatment was based on her race. She also claims she communicated this belief to Parnell and Coody during informal meetings and written documentation.  Plaintiff claims she was too afraid and intimidated to "use the word 'race' explicitly, but that she framed the issue in terms of "background" and "culture," which in her view essentially expresses the same thing.  Plaintiff's argument then descends into legal conclusions unsupported by any authority relating to proper *reporting* of a claim of race discrimination. But these arguments do not address the issue at hand - whether Jomori's comments and conduct are race-based, not whether Plaintiff reported them as such.[238] The argument that Jomori's conduct must have been based on race because Plaintiff was the only Black CSR is unsustainable because a mere difference in race, "[w]ithout more, ... does not support a finding that [plaintiff] suffered race ...-based harassment."[239]

---

[237] Rec. Doc. 53-5, p. 12

[238] This issue is addressed in the fifth prong of a hostile work environment prima facie case.

[239] *Byrnes v. City of Hattiesburg*, 662 Fed.Appx. 288, 290-91 (5th Cir. 2016) (citing *Hernandez*, 670 F.3d at 652).

The Court finds that the statements and conduct subjectively perceived by Plaintiff to be race-based are unsupported by the summary judgment record and applicable jurisprudence. A plaintiff's subjective belief that a vague term is discriminatory, no matter how genuine the belief, cannot provide the basis for relief.[240]

Considering the evidence in the light most favorable to Plaintiff, Jomori's conduct could be called unprofessional.   Likewise, there is competent summary judgment evidence that Jomori was quick to react, as evidenced by SET's decision to withdraw Plaintiff's PIP and Jomori's subsequent apology. But Plaintiff offers no evidence to justify her attributing Jomori's general hostility, rudeness, and unprofessional demeanor to racism. And in the Fifth Circuit, "hostile work environment jurisprudence 'does not prohibit all verbal or physical harassment in the workplace.'"[241]

There are many cases where similar or far more egregious workplace conduct than Jomori's has been found unsustainable under Title VII because the conduct was not connected to a protected characteristic.  In *Hernandez v. Yellow Transp., Inc.*, the Fifth Circuit noted that the district court did not err in finding that one of the key incidents, the plaintiff having been threatened by with a knife by a coworker, was irrelevant because there was no evidence that the event had anything to do with race.[242]  Other evidence was also rejected by the district court because, even if it reflected hostility toward one of the plaintiffs, there was no evidence that the actions were based on race.[243] Indeed, a wide range of conduct may render a workplace uncivil, but a plaintiff must show under

---

[240] *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (citing *Little v. Republic Refining Co.*, Ltd., 924 F.2d 93, 96 (5th Cir. 1991)).
[241] *Arredondo v. Schlumberger Ltd.*, 583 F.Supp.3d 783, 803 (W.D. Tex. 2022)(quoting *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 443 (5th Cir. 2011) (citation omitted)).
[242] 670 F.3d 644, 652 (5th Cir. 2012).
[243] *Id.*

Title VII that the conduct was based on race.[244]

For example, in *Keel v. Wal-Mart Stores, Inc.*, the district court, relying on *Hernandez*, rejected as evidence the fact that a co-worker regularly swore at and called the disabled plaintiff a "fat, lazy Motherf****r."[245]   The court noted that there was no evidence that the plaintiff "interpreted this comment to implicate his disability."[246]

In *Byrnes v. City of Hattiesburg*, the Fifth Circuit affirmed summary judgment in favor of an employer in a disability discrimination case.[247] The disabled plaintiff claimed he suffered a hostile work environment based on his race and his disability. The plaintiff testified that a co-worker threatened to steal his car, wreck his car, threatened the plaintiff's father, blocked the pathway to his office and refused to leave, and on one occasion, put his hands on the plaintiff's chest and pushed him.[248]   The Fifth Circuit affirmed summary judgment against the plaintiff, finding that he "failed to create a genuine issue of material fact that he was harassed because of his race or disability."[249]   This was because the plaintiff admitted that the co-worker did not refer to his race or disability when the harassing conduct occurred.[250]

In *Clark v. City of Alexandria*, the court rejected a race-based hostile work environment claim, finding that many of the plaintiff's allegations did "not bear any relationship to race."[251]   The plaintiff claimed that his supervisor "made intimidating and angry faces" at him; in a group setting the supervisor looked at each person with an angry

---

[244] *Id.* (citing Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)).
[245] No. 1:1-cv-248, 2012 WL 3263575, at *15 (E.D. Tex. July 17, 2012).
[246] *Id.*
[247] 662 F. App'x 288 (5th Cir. 2016).
[248] *Id.* at 289.
[249] *Id.* at 291.
[250] *Id.*
[251] No. 1:20-cv-01581, 2023 WL 5970196, at *9 (W.D. La. Sept. 13, 2023).

look; screamed at the plaintiff "in a hostile and demeaning tone" in front of other employees; and the supervisor failed to reprimand other employees who "verbally attacked" the plaintiff.[252]  The court found that there was no evidence that connected this behavior to the plaintiff's race.[253]

Here, Plaintiff offers no evidence or jurisprudence that would support the finding that her complaints about Jomori's conduct are objectively based on race. It is undisputed that Jomori never uttered a racially derogatory comment to Plaintiff, and he never attributed any anger or discipline to her race. Based on the above, the Court finds that Plaintiff has failed to satisfy a prima facie case of hostile work environment because she has failed to present evidence that the purported harassment was based on her race.

### 2. Severe or Pervasive

Although Plaintiff's failure to establish that her harassment was race-based forecloses her hostile work environment claim, the Court notes that this claim also fails on the requirement that the race-based harassment was so severe or pervasive as to permeate the workplace and create an abusive and hostile working environment. The Court looks to the totality of the circumstances, considering "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with

---

[252] *Id.*

[253] *Id.* (citing *Brew v. Weyerhaeuser NR Co.*, 537 F. App'x 309, 313 n.9 (5th Cir. 2013) ("We do not consider other incidents of alleged harassment not based on race ... because [plaintiff] has no evidence 'that the non-race-based harassment was part of a pattern of race-based harassment.'"); *Rome-Bienemy v. Children's Hosp.*, 2015 WL 8600689, at *8 (E.D. La. Dec. 14, 2015) ("Title VII does not provide a cause of action for work environments that are simply 'hostile.'") (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012)); *Russell v. Louisiana through Div. of Admin.*, 2006 WL 8432078, at *8 (M.D. La. Oct. 3, 2006) (granting summary judgment where "none of the defendants made derogatory statements to [plaintiff] regarding her race")).

an employee's work performance."[254]

Assuming *arguendo* that Plaintiff has presented evidence that Jomori's harassing conduct was frequent, Plaintiff's evidence of severity easily fails under a wealth of jurisprudence. In considering the severity of Title VII harassment, "[t]he Fifth Circuit has required racial insults to be extremely severe to survive summary judgment."[255] This requires "direct racial insults."[256]  As found above, there is absolutely no evidence in this case of direct racial insults to Plaintiff.  Plaintiff testified that at times, she felt intimidated and humiliated by Jomori's comments and conduct; however, the behavior is not tied to race and, as discussed below, is less severe than conduct courts have deemed sufficiently egregious.

In *Thompson v. Microsoft Corporation*, the Fifth Circuit affirmed summary judgment of an Americans with Disabilities Act ("ADA") disability-based hostile work environment claim where the plaintiff's employer made insensitive comments in response to the plaintiff's disclosed autism.[257]  The plaintiff claimed that the following comments by his supervisor constitute severe harassment: (1) the employer's comment that the plaintiff should "seek a different career" when the plaintiff told the employer he was autistic; and (2) that the employer told the plaintiff he was removed from a community pool based on his autism.[258] The court found that "[t]hese insensitive statements do not give rise to a hostile-work-environment complaint; they were no more than "a few harsh words[.]"[259]

---

[254] *Rodrigue v. PTS Management Group, LLC*, 550 F.Supp.3d 376, 397 (W.D. La. 2021)(quoting *West v. City of Houston, Texas*, 960 F.3d 736, 742 (5th Cir. 2020); *Harvill*, 433 F.3d at 435).
[255] *Daywalker v. University of Texas Medical Branch at Galveston*, 641 F.Supp.3d 362, 376 (S.D. Tex. 2022)(citing *e.g., E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 400 (5th Cir. 2007)).
[256] *Id.*
[257] 2 F.4th 460, 471 (5th Cir. 2021).
[258] *Id.*
[259] *Id.*

The plaintiff also claimed as harassment the employer's request that he prepare a presentation and then later reported that the presentation was done poorly.[260] This was also rejected by the court: "But '[c]riticism of an employee's work performance ... do[es] not satisfy the standard for a harassment claim' where 'the record demonstrates deficiencies in the employee's performance that are legitimate grounds for concern or criticism,' as it does here."[261]

In *Saketoo v. Administrators of the Tulane Education Fund*, the plaintiff, a female physician, asserted a hostile work environment claim against the administrators of her university employer, alleging they discriminated against her based on gender.[262]  The plaintiff presented evidence that her superior, Dr. Lasky, demeaned her with sporadic and abrasive conduct over the course of four years.[263] The Fifth Circuit recounted plaintiff's evidence of "severe" harassment by Dr. Lasky:

> This includes when Dr. Lasky (1) cut her off and told her it was "not her place" to discuss the needs of the clinic; (2) flailed his arms and yelled "I'm sick of this!" when she inquired about the use of funds; (3) hovered over her and shouted "I already told you what it was!" while documenting heart catheterization results; (4) mockingly asked her if she had "danced away scleroderma," upon which he interrupted, "We don't need you thinking! We need you working."; and (5) chastised her for teaching an undergraduate class, telling her to "[s]top it now!"[264]

However, the Fifth Circuit noted that "we have routinely held that similarly sporadic and abrasive conduct is neither severe nor pervasive.[265] And the fact that other women at the

---

[260] *Id.*

[261] *Id.* (quoting *Credeur v. La. through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017)(citation omitted)).

[262] 31 F. 4th 990 (5th Cir. 2022).

[263] *Id.* at 1003.

[264] *Id.*

[265] *Id.* at 1003-04 (citing *Kumar v. Shinseki*, 495 F. App'x 541, 543 (5th Cir. 2012) (per curiam) (affirming summary judgment rejecting a hostile work environment claim when "alleged hostility occurred sporadically over a 27-month period"); *Williams v. U.S. Dep't of Navy*, 149 F. App'x 264, 268 (5th Cir. 2005) (per curiam) (affirming summary judgment rejecting a hostile work environment claim involving an alleged harasser

School may have experienced severe or pervasive treatment does not save Dr. Saketkoo's claim."[266] The court further found that, even if the plaintiff had shown Dr. Lasky's treatment of her to be sufficiently severe to constitute harassment, her claim still failed because:

> Although she presented evidence of his tendency to degrade her, Dr. Saketkoo did not demonstrate that his actions were based on her gender. The record shows that Dr. Lasky treated male physicians in a similarly abrasive manner and that they also complained about his behavior. The consistency of Dr. Lasky's workplace demeanor is lamentable, but that circumstance does not supplant a plaintiff's burden to satisfy each element of a Title VII cause of action.[267]

Plaintiff herein has not offered a single case that would support her position that the facts and evidence she has presented were based on race or sufficiently severe to meet her hostile work environment prima facie burden. Accordingly, SET is entitled to summary judgment on Plaintiff's hostile work environment claim.[268]

### D. Retaliation

In her Opposition, Plaintiff contends she suffered unlawful retaliation in the following ways: (1) she was issued a PIP following her confrontation with Jomori after the 2019 birthday lunch and denied work from home flexibility provided to her white counterparts; (2) she "and the rest of the CSR department" had their weekly work hours

---

"yelling and displaying anger toward [plaintiff] over fax machine toner"); *see also Pennington v. Tex. Dep't of Fam. & Protective Servs.*, No. A-09-CA-287-SS, 2010 WL 11519268, at *10 (W.D. Tex. Nov. 23, 2010), *aff'd*, 469 F. App'x 332 (5th Cir. 2012) (holding plaintiff failed to establish a hostile work environment where the employer was "always hostile [and] threatening," screamed at plaintiff, and violated plaintiff's space by slamming files and doors)).

[266] *Id.* at 1004 (citing *Septimus v. University of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (observing that alleged harassment a plaintiff did not personally experience was inadequate to render her alleged harassment severe or pervasive)).

[267] *Id.*

[268] Because Plaintiff has failed to satisfy prongs three and four of her prima facie case, the Court need not consider prong five – whether the employer knew or should have known of the harassment in question and failed to take prompt remedial action. However, the notice requirement for a hostile work environment claim is similar to the "engaged in protected activity" requirement that the Court will fully address in evaluating Plaintiff's retaliation claim.

audited based on "incomplete data;" and (3) she was terminated because she complained to Jomori about Smothers' alleged "targeting" her, telling her she "did not fit in," and she was being subjected to unrealistic expectations.[269]

To establish a *prima facie* case of retaliation under the traditional *McDonnell Douglas* framework, "the plaintiff must establish that: (1) [s]he participated in an activity protected by Title VII; (2) h[er] employer took an adverse employment action against h[er]; and (3) a causal connection exists between the protected activity and the adverse employment action."[270]

An employee engages in activity protected by Title VII when the employee has "opposed any practice made an unlawful employment practice" by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[271]  The Supreme Court has explained that, to demonstrate retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[272] Furthermore, "opposing" a practice "only constitutes protected activity if the employer had some notice of both the employee's opposition and the discriminatory nature of the conduct being opposed."[273] Filing an internal complaint can also constitute protected activity. However, "while opposition to discrimination need not be in formal writing, internal

---

[269] Rec. Doc. 61-1, pp. 79-80, 82-83, 111-112, 137-138; Rec. Doc. 61-19. Plaintiff operative Complaint alleges that Jomori's lesser pay increase in 2020 was retaliatory (Rec. Doc. 22), but she abandons this claim by not responding to it in her Opposition. Alternatively, the Court has already held that the lesser pay increase was not an adverse employment action.

[270] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

[271] 42 U.S.C. § 2000e–3(a); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

[272] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006) (citations omitted).

[273] *Henderson v. Bd. of Supervisors of S. Univ. & A&M Coll.,* No. CV 21-297-JWD-RLB, 2023 WL 2614620 (M.D. La. Mar. 23, 2023).

complaints must reference discrimination or other unlawful employment activity in order to be protected."[274] Additionally, "[m]agic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue."[275]

If the plaintiff establishes a *prima facie* case, then the employer has the burden of production to provide "a legitimate, non-discriminatory reason" for the adverse employment action.[276] If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual.[277] "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence."[278] Ultimately, in order to survive a motion for summary judgment, a plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the employer would not have taken the adverse employment action *but for* the protected activity.[279] "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions."[280]

As the Fifth Circuit explained in *Owens v. Circassia Pharms., Inc*.:

An employee can establish pretext in the context of retaliation by showing that a discriminatory motive more likely motivated her employer's decision. In order to survive a motion for summary judgment, the plaintiff must show

---

[274] *Allen v. Johnson,* No. CIV.A. 13-503-JWDSCR, 2014 WL 7334901 (M.D. La. Dec. 19, 2014) (citing *Rodriquez v. Wal–Mart Stores, Inc.,* 540 Fed. Appx. 322 (5th Cir.2001)).

[275] *Brown v. United Parcel Serv., Inc.,* 406 F. App'x 837 (5th Cir. 2010).

[276] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).

[277] *Id.*

[278] *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll*., 719 F.3d 356, 363 (5th Cir. 2013).

[279] *Musser v. Paul Quinn Coll*., 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 658 (5th Cir. 2012))(emphasis added).

[280] *Owens v. Circassia Pharms., Inc*., 33 F.4th 814, 826 (5th Cir. 2022)(citing *Laxton v. Gap, Inc*., 333 F.3d 572, 579 (5th Cir. 2003)).

a conflict in substantial evidence on this issue. At this juncture, we consider numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.

…

This inquiry **requires a greater showing than mere causal connection. It requires that the plaintiff show that protected conduct was *the* reason for the adverse action**. In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, **no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct**.[281]

### 1. Adverse Employment Action

First, the Court will determine whether Plaintiff's complaints constitute adverse employment actions. It is undisputed that Plaintiff's termination constitutes an adverse employment action. However, her other claims of retaliation are questionable. Even after *Hamilton*, the Fifth Circuit has confirmed that written reprimands, placement on a PIP, and other corrective or remedial measures do not constitute adverse employment actions unless they "affect job title, grade, hours, salary, or benefits or cause a diminution in prestige or change in standing among coworkers."[282] This makes sense because "immunity from criticism cannot, logically or legally, be a 'term, condition, or privilege of employment.'"[283] Additionally, discipline that is later reversed or rescinded cannot support

---

[281] *Id.* at 835 (emphasis added).

[282] *Lemonia v. Westlake Mgmt. Servs., Inc.*, No. 22-30630, 2023 WL 6878915, at *7 (5th Cir. Oct. 18, 2023) (cleaned up) (citing *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 823, 826 (5th Cir. 2019), *abrogated on other grounds by Hamilton*, 79 F.4th at 502–06); see id. at *7 ("[T]he district court did not err to the extent the court concluded that Lemonia's placement on a PIP, without more, did not constitute an adverse employment action."); *Moye v. Tregre*, No. 22-30341, 2024 WL 65424, at *3 (5th Cir. Jan. 5, 2024) ("The remedial training requirement is, at most, differential treatment that helps the employee." (citation and quotation marks omitted)).

[283] *Fleming v. Methodist Healthcare System of San Antoio, Ltd., LLP*, 2024 WL 1055120, *13 (citing *cf. Smith v. McDonough*, No. SA-22-CV-01383-JKP, 2023 WL 5918322, at *5 (W.D. Tex. Sept. 8, 2023) ("Smith's allegations of discrimination based on criticism and scrutiny of his work and having his telecommuting agreement revoked could potentially support a finding that he was denied the terms, conditions, and privileges of employment.")).

a retaliation claim.[284] Thus, being placed on a PIP that was later withdrawn cannot form the basis of a retaliation claim.

Plaintiff contends after threatening an unspecified EEOC complaint in response to the PIP, she "experienced increased scrutiny and was denied flexible work accommodations previously available to her and others."[285] As the Court previously found, the change in remote working policy did not constitute more than *de minimus* harm and does not qualify as an adverse employment action.[286]

As for the auditing of the CSR department's working hours, Plaintiff argued that the audit occurred based on SET's mistaken belief that she was only working 20 hours per week.[287] But Plaintiff's own evidence undermines this claim. Plaintiff's notes attached to Coody's deposition state that, during Plaintiff's conversation with Coody on August 4, 2022, Coody asked Plaintiff "do you know why the schedule was changed … because *your entire team has been being investigated for the last four months*" because "no one has worked 40 hours."[288] Plaintiff confirms with her own notes that the audit targeted the entire department, including white employees, and it was not based on only one pay period but was a four-month investigation. The audit of the entire CSR department cannot form the basis of a retaliation claim.

---

[284] *See Willis v. W. Power Sports, Inc.*, No. 23-10687, 2024 WL 448354, at *2 (5th Cir. Feb. 6, 2024) ("Willis fails to show that he suffered an adverse employment action. Willis's complaint alleges that he complained of the discrimination on August 20 (one day after he was first fired) and was almost immediately rehired."); *see also Brooks v. Hous. Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 590 (S.D. Tex. 2015) (decision to terminate employee that was later rescinded was not adverse employment action for retaliation claim: "Because the August 2012 decision to terminate her was rescinded with no loss of pay, it is not an adverse employment action.").

[285] Rec. Doc. 63, p. 30.

[286] The claim would additionally fail the causation prong based on the lack of temporal proximity – Plaintiff was placed on the PIP in December 2019, the change in remote work policy occurred in late 2021 after Smothers became Plaintiff's supervisor.

[287] Rec. Doc. 63, p. 30.

[288] Rec. Doc. 61-19, p. 1 (emphasis added).

A department-wide audit is not unlike a company's reduction in force. In *Baker v. American Airlines*, the plaintiff was terminated pursuant to a company-wide ten percent reduction in force after the events of September 11, 2001.[289] Although he failed to present any supporting evidence, the plaintiff claimed that he was targeted based on his age.[290] The court rejected both the discrimination and retaliation claims asserted, finding that the plaintiff failed to submit any evidence that a company-wide reduction in force was merely a pretext to get rid of her, specifically.[291]

Based on the foregoing, the Court finds that the only adverse employment action taken against Plaintiff was her termination.

### 2. Protected Activity

The parties also dispute whether Plaintiff has established the first prong – that she engaged in Title VII protected activity. In *Davis v. Dallas Independent School Dist.*,[292] the Fifth Circuit shed light on the specificity required to demonstrate engagement in a Title VII protected activity:

> We have consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity. *See, e.g., Tratree v. BP N. Am. Pipelines, Inc.*, 277 Fed. Appx. 390, 395 (5th Cir. 2008) ("**Complaining about unfair treatment without specifying why the treatment is unfair ... is not protected activity**."); *Harris-Childs v. Medco Health Solutions, Inc.*, 169 Fed. Appx. 913, 916 (5th Cir. 2006) (affirming summary judgment on retaliation claim where plaintiff **never "specifically complained of racial or sexual harassment, only harassment"**); *Moore v. United Parcel Serv., Inc.*, 150 Fed. Appx. 315, 319 (5th Cir. 2005) ("Moore ... was not engaged in a protected activity, as his grievance did not oppose or protest racial discrimination or any other unlawful employment practice under Title VII."); *see also Evans v. Tex. Dep't of Transp.*, 547 F. Supp. 2d 626, 654 (E.D. Tex. 2007) ("Plaintiff has not shown that she engaged in a statutorily

---

[289] 430 F.3d 750, 754 (5th Cir. 2005).
[290] *Id.*
[291] *Id.*
[292] 448 F. App'x 485 (5th Cir. 2011).

protected activity. Specifically, although Evans complained of a purportedly hostile work environment, at no time did she suggest that [the conduct at issue] was related to Evan's race, sex, ... or other characteristic protected by Title VII.").[293]

In *Davis*, when the plaintiff stated in a meeting that a supervisor "created a 'hostile work environment," the Fifth Circuit found that did "not itself constitute 'protected activity' within the meaning of Title VII, as this complaint lacked a racial or gender basis."[294]

There is absolutely no record evidence that Plaintiff ever indicated that the alleged hostile environment she suffered was based on the protected status of her race. The written rebuttal to the PIP mentions the words hostile environment but never specifically connects the claim to race. The purported threat to file an EEOC complaint, made to Coody[295] and noted by Parnell in her 2019 birthday lunch incident Notes,[296] does not indicate that Plaintiff advised that the nature of any potential EEOC complaint was based on Plaintiff's race. In reference to Coody's notes, Coody testified: "I think at the end of the conversation, I wanted – I don't know if she had made a comment to the EEOC at some point, but I advised her that she – I asked her if she had filed a complaint, she said no. I told her she had a right to do that if she wanted, but I wanted her to understand if she had any further complaints, she could come to me. So we documented that at the end of the sheet."[297] Coody further testified that Plaintiff never made a complaint of discrimination after she received the PIP.[298] Plaintiff admitted she cannot remember if she ever reported race discrimination to Parnell.[299]

---

[293] *Id.* at 493.
[294] *Id.* (citing 42 U.S.C. § 2000e-3(a)).
[295] Rec. Doc. 61-16, p. 1 ("EEOC comment =>gave employee avenue to report properly to HR.").
[296] Rec. Doc. 61-25, p. 2 (Plaintiff "said she know she could have gone and filed an EEOC but she loves the company.").
[297] Rec. Doc. 61-3, pp. 18-19.
[298] *Id.* at p. 27.
[299] Rec. Doc. 61-1, p. 68.

Plaintiff has also contradicted her own testimony regarding whether she expressly reported race as a basis for alleged discrimination.  In her deposition, Plaintiff testified that she could not recall the wording she used, but she "definitely" said she was being "treated differently because I was different in regard to my race," although in the same sentence she said her statement to Jomori was not that she was being treated differently because she is Black, but because of her "culture and background."[300] When questioned about the PIP rebuttal, Plaintiff stated: "I definitely did not say Mr. Jomori is mistreating me because I'm black."[301]  But then Plaintiff testified that "she know[s] [she] put [a race complaint] in an email somewhere," but she would have to find it.[302]  No such email was submitted in this matter. When pressed further on why Plaintiff never specifically referenced her race as the reason for discrimination, Plaintiff testified: "I may have been afraid to say, oh, Mr. Jomori, you are doing this to me because I'm Black.  Yes … I was afraid to say that, definitely … So … forgive me if I didn't say you are doing this to me because I'm Black.  I didn't know it was a requirement that I spell it out."[303] As discussed above, it is, indeed, a requirement that Plaintiff "spell it out."

Regarding Plaintiff's termination, which is the only adverse employment action for purposes of her retaliation claim, Plaintiff claims that she was terminated in retaliation for reporting Smothers to Jomori.[304] SET contends Plaintiff has failed to demonstrate how reporting Smothers to Jomori constitutes protected activity.  She relayed to Jomori, her alleged former harasser, that she was "confused and uncomfortable" about who she

---

[300] Rec. Doc. 53-3, pp. 47-48.
[301] *Id.* at p. 80
[302] *Id.* at pp. 81-83.
[303] *Id.* at pp. 86-87.
[304] Rec. Doc. 53-3, pp. 137-138; Ex. 4 to Depo.

reports to, she complained about the remote work policy, and she complained about a conversation between herself and Smothers wherein she claims Smothers was "completely dishonest" about her ability to work from home.[305]  Ironically, she indicates she would rather her work instructions come from Jomori than Smothers because Smothers "is a dishonest person" that she does "not trust."[306] Nowhere in this email does Plaintiff attribute Smothers' treatment of her to her race, which makes sense because Smothers is also African-American.

Plaintiff responds claiming that in this email to Jomori, she describes being told she was "not a good fit," she felt targeted, and she felt she was being subjected to unrealistic expectations.[307]  For context, Plaintiff wrote "I was told by Brad that maybe I am no longer a good fit for this company and maybe other alternatives should be considered by myself because the schedule will not be altered[.]"[308] The context of Brad advising Plaintiff that she might no longer "be a good fit" for the company was in relation to her repeated complaints about the remote work schedule, not about Plaintiff's race. None of Plaintiff's complaints about Smothers to Jomori constitute Plaintiff's "opposition to any practice made unlawful by Title VII" or constitute making "a charge, testified, assisted, or participated in a Title VII proceeding or investigation."[309] Accordingly, Plaintiff has failed to show that she engaged in protected activity under Title VII, and SET is entitled to summary judgment on this claim.

---

[305] Rec. Doc. 53-3, Ex. K to Depo (ECF p. 99).
[306] *Id.*
[307] *Id.* (ECF p. 101).
[308] *Id.*
[309] *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 576-77 (5th Cir. 2020)(internal quotation marks omitted).

### 3. Causation – Temporal Proximity

Plaintiff also fails to satisfy the prima facie causation requirement for a retaliation claim. In *Lyons v. Katy Independent School District*,[310] the Fifth Circuit explained the principles applied to the causation requirement:

> "Close timing between an employee's protected activity and an adverse action against him *may* provide the 'causal connection' required to make out a prima facie case of retaliation."[311] The Supreme Court has observed that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case [of retaliation] uniformly hold that the temporal proximity must be 'very close.'"[312] We have ruled, for example, that a six-and-a-half-week timeframe is sufficiently close,[313] but that a five month lapse is not close enough, without other evidence of retaliation, to establish the "causal connection" element of a prima facie case of retaliation.[314]

The *Lyons* court found that a nine-month lapse between the plaintiff's protected activity and the adverse employment action was insufficient evidence of causality to establish a prima facie case of retaliation."[315] In *Wright v. Union Pacific Railroad Co*., the Fifth Circuit held that a more than two-year time lapse between an employee's protected activity of filing an employment discrimination lawsuit and the employee's termination was "too

---

[310] 964 F.3d 298 (5th Cir. 2020).

[311] *Id.* at 305 (quoting *Swanson v. Gen. Servs. Admin*., 110 F.3d 1180, 1188 (5th Cir. 1997) (emphasis added by Fifth Circuit)).

[312] *Id.* (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *see also Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (commenting on Breeden and observing that, "temporal proximity alone, when very close, can in some instances establish a prima facie case of retaliation" but also rejecting the "notion that temporal proximity standing alone can be sufficient proof of but for causation" once the burden shifts back to the employee under the *McDonnell Douglass* framework)).

[313] *Id.* (citing *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 949 (5th Cir. 2015); *see also Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 913 (5th Cir. 2010) (unpublished) (concluding that one month between was sufficiently close); *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (concluding that a five-day lapse was sufficient to satisfy the third element of a prima facie case of retaliation)).

[314] *Id.* (citing *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (noting that a district court in this circuit has found that "a time lapse of up to four months has been found sufficient")).

[315] *Id.* at 306.

remote to permit a reasonable inference of causation."[316]

Here, Plaintiff contends that, since she reported Smothers' treatment of her on August 3, 2022, and she was terminated on August 4, 2022, the timing between her "protected activity – especially her email regarding Mr. Smothers – and her termination strongly supports a causal connection."[317] However, Plaintiff's report of Smothers to Jomori does not constitute protected activity as held above. The other instances of purported protected activity took place in late 2019, nearly three years before Plaintiff was terminated. Applying the foregoing jurisprudence, the Court finds that, even if 2019 complaints about Jomori constituted protected activity, the lapse in time between these reports and Plaintiff's termination is too remote in time to permit a reasonable inference of causation.

Additionally, the Fifth Circuit has held that, even at the prima facie stage, temporal proximity can only establish a causal link when it is connected to the decision maker's knowledge of the protected activity.[318] It is undisputed that Smothers was not employed

---

[316] 990 F.3d 428, 433-34 (5th Cir. 2021)(citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that an adverse action taken twenty months after employer became aware of protected activity "suggests, by itself, no causality at all"); *Leal v. McHugh*, 731 F.3d 405, 417 (5th Cir. 2013) (affirming dismissal of retaliation claim because "a three-year lapse, at best, between the protected activity and the adverse employment action is too attenuated temporally to state a claim for relief, even if [plaintiff's supervisor] was aware of the activity")).

[317] Rec. Doc. 63, p. 31.

[318] *Thompson v. Somervell County, Tex.*, 431 F. App'x 338, 342 (5th Cir. 2011)(citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (emphasis added) (internal quotation marks and citation omitted)); *Cothran v. Potter*, 398 Fed.Appx. 71, 73–74 (5th Cir.2010) (unpublished) ("The combination of temporal proximity and knowledge of a protected activity may be sufficient to satisfy a plaintiff's prima facie burden for a retaliation claim"); *Ramirez v. Gonzales*, 225 Fed.Appx. 203, 210 (5th Cir.2007) (unpublished) ("Fifth Circuit precedent requires evidence of knowledge of the protected activity on the part of the decision maker and temporal proximity between the protected activity and the adverse employment action."); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir.2000) ("[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.")).

by SET until July 2022, two and a half years after Plaintiff's prior "reports."[319]

Plaintiff does not address the requirement that, to establish a causal link, "the decision maker must know of the protected activity when the *decision* to take the adverse employment action occurred,"[320] and there is no evidence in the record to show that Smothers had such knowledge. Plaintiff likewise fails to address that retaliation requires but-for causation; she neither argues nor presents any evidence to show that but-for any protected activity, she would not have been terminated.

As discussed above in evaluating Plaintiff's disparate treatment claims, SET provided several legitimate, non-discriminatory reasons to support Plaintiff's termination, and she failed to demonstrate competent summary judgment evidence to suggest any of these reasons were a pretext for race discrimination. Had Plaintiff satisfied her prima facie burden for retaliation, that same pretext analysis would apply with equal force. SET is entitled to summary judgment on Plaintiff's retaliation claim.

### E. FMLA Interference and Retaliation Claims

The FMLA permits eligible employees "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."[321] The statute guarantees eligible employees a total of twelve weeks of leave in a one-year period when the leave relates to an employee's serious medical condition.[322] Upon an employee's timely return, the employer must

---

[319] Rec. Doc. 61-4, p. 140.

[320] *Williams v. Franciscan Missionaries of Our Lady Health Systems, Inc.*, 190 F.Supp.3d 561, 565 (M.D. La. 2016), *aff'd*, 689 F. App'x 374 (5th Cir. 2017)(citing *Reynolds v. Extendicare Health Servs., Inc.*, 257 Fed.Appx. 914, 919 (6th Cir.2007) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272–73, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001))).

[321] *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008)(citing 29 U.S.C. § 2601(b)(2)).

[322] 29 U.S.C. § 2612(a)(1).

reinstate the employee "to the same position as previously held or a comparable position with equivalent pay, benefits, and working conditions."[323]

The FMLA prohibits an employer from interfering with, restraining, or denying the exercise or attempted exercise of an employee's right to take FMLA leave.[324] The statute also makes it unlawful for an employer to discharge or retaliate in any other manner against an individual for opposing the employer's unlawful FMLA practices.[325]

Plaintiff has asserted a claim for FMLA interference and FMLA retaliation. To state a prima facie FMLA interference claim, a plaintiff must allege that "(1) [s]he was an eligible employee; (2) h[er] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of h[er] intention to take FMLA leave; and (5) h[er] employer denied h[er] the benefits to which [s]he was entitled under the FMLA."[326] The employee must also show that she was prejudiced by such violation.[327] "To state a prima facie claim for discrimination or retaliation under the FMLA, the plaintiff must allege that (1) [s]he is protected under the FMLA; (2) [s]he suffered an adverse employment decision; and either (3a) the plaintiff was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because of the plaintiff's request for leave."[328]

---

[323] *Smith v. E. Baton Rouge Parish Sch. Bd.*, 453 F.3d 650, 651 (5th Cir. 2006)(citing 29 U.S.C. § 2614(a)(1)).
[324] 29 U.S.C. § 2615(a)(1).
[325] 29 U.S.C. § 2615(a)(2).
[326] *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021) (quoting *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017)).
[327] *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).
[328] *Hester*, 11 F.4th at 305 (internal quotation marks and citation omitted).

### 1. <u>Plaintiff Not Eligible Employee/Not Protected Under the FMLA</u>

The undisputed evidence in this case and Plaintiff's own admissions foreclose her FMLA claims.  Plaintiff admitted that on August 6, 2022, at 10:50 am, Coody sent her a termination letter and severance agreement.[329] Plaintiff also admitted that, on August 6, 2022, she did not notify SET that her doctor had placed her on medical leave for stress until 3:33 p.m., acknowledging that "the Company had already executed the termination that morning."[330]

In her Opposition, Plaintiff attempts to distance herself from these admissions, stating that the argument that she was not an eligible employee at the time of the request is "based on Defendant's claim that Plaintiff was terminated prior to providing notice that she intended to take FMLA leave, a material fact which is expressly disputed."[331] This argument, which is not evidence, cannot erase Plaintiff's evidentiary admissions. Plaintiff has not demonstrated a genuinely disputed material fact regarding the date and time of her termination.

In *Gray v. Winco Foods, LLC*, after the plaintiff was terminated, he alleged his employer interfered with his FMLA rights.[332]  The evidence showed that the decision to terminate the plaintiff was made in early July 2020, long before he contracted COVID-19, for which he requested FMLA leave.  The Court noted that the plaintiff failed to present "any evidence disputing the fact that [his employers] drafted Plaintiff's termination letter two days before Plaintiff texted Miller to notify him of his wife's COVID-19 symptoms. This was, by all accounts, a case where the "wheels of termination were put in motion before

---

[329] Rec. Doc. 57-1, p. 11, ¶ 59.
[330] *Id.* at p.11-12, ¶ 60.
[331] Rec. Doc. 63, p. 32.
[332] 683 F.Supp.3d 571 (E.D. Tex. 2023).

the request for leave."[333] As for the plaintiff's FMLA retaliation claim, the court explained:

> "While the employee has a right to take leave under the FMLA, the employee must give his employer notice of his intention to take leave in order to be entitled to it." *Acker*, 853 F.3d at 788. Plaintiff does not dispute that he did not submit a FMLA request to FMLASource until after he was terminated. *Cf. Price v. Ajinomoto Foods N. Am., Inc.*, No. 3:20-cv-00253, 2021 WL 5068530, at *3 (N.D. Miss. Nov. 1, 2021) ("Because the Plaintiff **did not attempt to apply for FMLA leave until after the date her employment was terminated**, she did not engage in any FMLA-protected activity and she cannot show a causal link between any protected activity and her discharge from employment.").[334]

Under 29 C.F.R. § 825.110(a)(3), an "eligible employee" under the FMLA is one who "is employed at a worksite ..."  At the time Plaintiff advised SET of her doctor's orders, she was no longer employed. And even if she could establish that SET had notice that she was going to request FMLA leave the day before her termination (which she cannot), "the wheels of termination were put in motion before the request for leave." Simply put, "[e]mployees cannot immunize themselves from legitimate termination by taking FMLA leave."[335]

Accordingly, the undisputed evidence establishes that Plaintiff was not an eligible employee at the time she purportedly requested leave, and she was not entitled to FMLA protection for purposes of retaliation.

### 2. Notice Requirement

Plaintiff also fails to satisfy the notice requirement. When an employee is eligible under the FMLA, "'the employee must give his employer notice of his intention to take

---

[333] *Id.* at 615-16 (citing *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 926 (5th Cir. 1999) ("[W]here the wheels of termination were put in motion before the request for leave, the court finds that the restoration provision should not apply.") (quoting *Tuberville v. Pers. Fin. Corp.*, No. 3:95-cv-150, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996))).

[334] *Id.* at 617.

[335] *Amedee v. Shell Chemical LP*, 953 F.3d 831, 836 (5th Cir. 2020).

leave in order to be entitled to it."[336] When giving notice, an employee need not 'expressly invoke[ ]' the FMLA.[337] 'The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'[338] But "[w]hile an employer's duty to inquire may be predicated on statements made by the employee, the employer is not required to be clairvoyant.'"[339]

Plaintiff argues SET had notice of her request for FMLA leave prior to her termination. Plaintiff states that on August 4, 2022, she requested to work from home "due to her deteriorating health."[340] There is no citation to evidence to support this statement. Plaintiff says that SET responded to this purported request by telling her "not to report to work on Friday, August 5, 2022, as they reviewed her request."[341] Plaintiff's own evidence shows this statement to be a gross mischaracterization of the exchange with Coody. Plaintiff's typed notes from her conversation with Coody on August 4, 2022 start as follows:

> I received an email from Dana Coody, HR manager, Caucasian female, on 08.04.2022 asking if I had time to speak. I walked outside and phoned her from my cell. First and opening sentence was I just spoke with Mr. Jomori about your email. She then angrily said, I want you to go home today and do not come in tomorrow. I will call you tomorrow on how to move forward. I said move forward in what way. She then said it's obvious you're unhappy, you said the environment is toxic so you need to go home, I need to remove you from the environment and we'll come up with some type of severance or something. I then said severance for what, so there's a possibility of me losing my job? She again stated you emailed Mr. Jomori, going on and on about Brad and you are obviously unhappy so you need to leave and pick up your kids and I will call you tomorrow. She yelled, do not work and do

---

[336] *Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1002 (5th Cir. 2024)(quoting *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (emphasis added by Fifth Circuit)).
[337] *Id.* at 1002 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995).
[338] *Id.* at 1002 (quoting *Manuel*, 66 F.3d at 764).
[339] *Id.* at 1002 (quoting *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998).
[340] Rec. Doc. 63, p. 32.
[341] *Id.*

not make contact with anyone. I said, Dana you're sending me home because I emailed Mr. Jomori about Brad.  She said yes, I need you to go home and get your kids, don't you have to get you kids (sarcastically) and went on to say, it's toxic so go home.  I then told her that I did not say it was toxic … I said it is not the same.[342]

Plaintiff's notes do not mention any request for FMLA leave to accommodate a "serious medical condition," and it is clear from the notes that Coody did not send Plaintiff home and tell her not to report to work the next day so SET could "review[] her request."[343]

Plaintiff claims she emailed Coody advising her that Plaintiff was at the doctor on August 5, 2022, "putting SE Tylose on notice that Plaintiff was seeking medical treatment for a serious health condition."[344] This is an unsupported legal conclusion and the supporting citation states only that Plaintiff advised Coody she was at the doctor's office and would call Coody when she was done, nothing more.[345]

Plaintiff also claims SET was already aware that Plaintiff suffered from anxiety.[346] It is true that there are HR documents noting that Plaintiff has complained about work-related stress and Jomori's conduct contributing to her anxiety.  However, the Fifth Circuit holds that an employee's reference to management about a mental condition "does not constitute the requisite notice of an intent to invoke FMLA leave."[347]

Plaintiff also contends she had previously inquired about short-term disability benefits and discussed potential medical leave options, including FMLA, with HR."[348]

---

[342] Rec. Doc. 61-19, p. 1.
[343] Rec. Doc. 63, p. 32.
[344] *Id.*
[345] Rec. Doc. 61-33.
[346] Rec. Doc. 63, p. 32.
[347] *Seaman v. CSPH, Inc.*, 179 F.3d at 302 (citing *e.g., Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d 973 (5th Cir.1998) (holding that plaintiff who provided only meager information of her condition to her employer and who failed to inform employer of scheduled doctor's appointment did not give adequate notice under the FMLA)).
[348] *Id.*

There is likewise no evidence in the record to support this statement.

The Court finds that, even if Plaintiff could show that she was an eligible employee/protected employee under the FMLA, she has failed to demonstrate a genuine fact issue about whether she provided necessary notice to SET.  Accordingly, SET is entitled to summary judgment on Plaintiff's FMLA claims.

## III.    CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment[349] by Defendants, SE Tylose Louisiana, LLC and SE Tylose Louisiana USA, Inc., is GRANTED. Plaintiff, Tatonya Johnson's claims are dismissed WITH PREJUDICE.

Judgment shall be entered accordingly.

Baton Rouge, Louisiana, this 31st day of March, 2026.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[349] Rec. Doc. 53.